In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-12-00573-CV**
_____

**THE NOTE INVESTMENT GROUP, INC., Appellant**

**V.**

**ASSOCIATES FIRST CAPITAL CORP., SUCCESSOR BY MERGER TO ASSOCIATES FINANCIAL SERVICES COMPANY, INC., Appellee**

**On Appeal from the 9th District Court**
**Montgomery County, Texas**
**Trial Cause No. 09-12-12262 CV**

**OPINION**

This is an appeal from a dispute between appellant, The Note Investment Group, Inc. ("TNIG"), and appellee, Associates First Capital Corp., successor by merger to Associates Financial Services Company, Inc. ("Associates"), regarding the sale by TNIG of partial interests in certain seller-financed notes and contracts for deed to Associates. In three points of error, TNIG contends that the trial court erred by: (1) awarding litigation costs to Associates under Texas Rule of Civil

1

Procedure 167; (2) concluding that Associates made a valid tender of funds to TNIG, thereby precluding TNIG's recovery of attorney's fees and interest following the date of the tender; and (3) reconsidering and granting Associates' motion for partial summary judgment without notice after previously denying same. We affirm.

## I.     Factual Background

### A.     Associates' Purchases of Seller-Financed Notes and Contracts for Deed

Associates, through its private mortgage operations division ("PMO"), was in the business of purchasing seller-financed notes and contracts for deed. In some cases, Associates purchased the entirety of a note or contract for deed, and in each such instance, Associates paid the full purchase price for the note or contract at the time of the purchase. In other cases, Associates purchased only a partial interest in the note or contract for deed. A "partial interest" consists of a set number of payments under a note or contract for deed.[1] On occasion, Associates purchased the "back-end" or remainder interest in a note or contract for deed after initially

---

[1] For example, if a note provided for 240 monthly payments, and at the end of the first year of the note, Associates purchased the next ten years of payments (the next 120 consecutive monthly payments), Associates would have purchased a 120-month partial interest in the note consisting of payment numbers 13 through 132.

2

purchasing a partial interest. The "remainder interest" consisted of all payments remaining due under the note or contract following the partial interest.[2]

In 1999, Associates began purchasing partial interests in seller-financed notes and contracts for deed from TNIG. Each transaction involving the sale of a partial interest was governed by an individual, transaction-specific written agreement between TNIG and Associates, taking one of two forms. For transactions involving the sale of a partial interest in a promissory note secured by a deed of trust, TNIG and Associates entered into a written agreement called a "Deed of Trust Participation Agreement." For transactions involving the sale of a partial interest in a contract for deed, TNIG and Associates entered into a written agreement called an "Agreement for Purchase of a Participation in an Installment Land Sales Contract." For simplicity, and unless otherwise stated, we refer to both types of agreements collectively as "DOTPAs."

The DOTPAs provided for certain contingencies based on the manner in which the borrower's payments under the note or contract for deed were ultimately made. First, if a note or contract for deed was paid in full by the borrower prior to the end of Associates' partial interest, the DOTPAs provided that Associates would

---

[2] Thus, in the foregoing example, the remainder interest in the note consists of the remaining 108 monthly payments following the expiration of Associates' partial interest (i.e., payment numbers 133 through 240).

be entitled to retain a certain portion of the payoff proceeds (the "Guaranteed Yield"). All proceeds in excess of the Guaranteed Yield were required to be paid to the "Seller," which the DOTPAs defined as TNIG. When a note or contract for deed was paid in full by the borrower prior to the end of Associates' partial interest, the partial interest in the note or contract for deed was referred to as a "paid-off" partial.

Second, if a note or contract for deed went into default for a period of sixty days during the time period covered by Associates' partial interest, the DOTPAs provided that TNIG was entitled to either (1) repurchase Associates' interest in the note or contract for deed within thirty days following notice from Associates, or (2) cure the default within thirty days and undertake in writing to make all future scheduled payments to Associates. If TNIG failed to repurchase Associates' interest or cure the default in a timely manner, Associates had the right under the DOTPAs to foreclose on the property that was the subject of the note or contract for deed. In the event of a foreclosure sale, the DOTPAs provided a formula for the calculation of the amount of the foreclosure proceeds that Associates was entitled to retain (the "Foreclosure Minimum"), and all proceeds, if any, in excess of the Foreclosure Minimum were to be paid to the "Seller."

Third, if all payments were timely made to Associates under its partial interest as they became due, the Deed of Trust Participation Agreements provided that Associates, upon receipt of the final payment under the partial interest, was required to assign the note to the owner of the remainder interest and advise the borrower to make all future payments to the "Seller." Under such circumstances, the partial interest in the note was referred to as a "paid-out" partial.

TNIG brokered the sales of the partial interests to Associates. Specifically, TNIG purchased notes or contracts for deed in their entirety from third-party sellers, and on the same day or shortly after those purchases, TNIG sold partial interests in those notes or contracts for deed to Associates. In many cases, TNIG purchased the notes and contracts for deed from its sellers under purchase agreements requiring two installment payments by TNIG. Under those purchase agreements, TNIG agreed to pay the first installment to its seller at the time it purchased the note or contract for deed from the seller, and it agreed to pay the second installment to its seller thirty-six months thereafter, provided that the note or contract for deed did not go into default or was not paid in full prior to that time. If the note or contract went into default within the first thirty-six months of TNIG's purchase, TNIG was not required to pay the second installment to its seller. If the note or contract for deed was fully paid within the first thirty-six months of

TNIG's purchase, TNIG was required to pay its seller the second installment at the time of the payoff, and TNIG usually made such payment using the excess funds that TNIG received from Associates for the paid off partial under the terms of the DOTPAs. However, if the note or contract for deed did not go into default and was not fully paid within the first thirty-six months of TNIG's purchase, TNIG was contractually obligated to pay its sellers the second installment on the thirty-six month anniversary of its original purchase of the note or contract.

## B.     The "Global Agreement" Dispute

Most, if not all, of the sales of partial interests by TNIG to Associates occurred between late 1999 and mid-2001. In 2000, Citigroup, Inc. ("Citigroup") acquired Associates. Within a few months of the acquisition, Citigroup decided to wind down the operations of Associates' PMO division and to cease purchasing seller-financing paper. Accordingly, in May 2001, Associates notified its brokers and sellers, including TNIG, that it would no longer be purchasing seller-financing paper, and in June 2001, Associates ceased purchasing such paper from its brokers and sellers.

After Associates announced that it would no longer be purchasing seller-financing paper, TNIG contacted the sellers to whom it owed second installment payments and offered to reassign each seller the remainder interest in the note or

6

contract for deed in exchange for that seller's agreement to release TNIG from its obligation to make the second installment payment under the purchase agreement. In some cases, TNIG's seller accepted the offer, and TNIG assigned the remainder interest in the note or contract for deed back to the seller, who released TNIG from its obligation to pay the second installment obligation under the purchase agreement. In other cases, TNIG's sellers did not accept the offer, and in many such cases, TNIG failed to pay the second installment owed to its seller when it became due. At least two of those sellers sent demand letters to TNIG threatening to sue TNIG if it did not immediately make the second installment payment under their purchase agreements with TNIG. One seller ultimately filed suit against TNIG and Associates based on TNIG's alleged failure to make the second installment payment under the seller's purchase agreements with TNIG.

According to TNIG's pleadings in the present lawsuit, TNIG sent a series of letters to Associates in February and March 2003. In those letters, TNIG claimed that Associates was contractually bound to purchase the remainder interests in the notes and contracts for deed in which Associates had previously purchased partial interests from TNIG. Specifically, TNIG claimed that Associates and TNIG entered into an agreement (the "Global Agreement") in 1999 and that under such agreement, Associates had agreed to purchase the entirety of certain notes and

7

contracts for deed from TNIG through a two-staged funding arrangement that essentially mirrored the terms of TNIG's purchase agreements with its sellers. According to TNIG, the Global Agreement required Associates: (1) to purchase a partial interest from TNIG in each of the notes and contracts for deed that formed the basis of the Global Agreement (the first funding stage), and (2) to subsequently purchase the remainder interest in each note and contract for deed thirty-six months after the date of Associates' partial interest purchase (the second funding stage). TNIG demanded that Associates pay the purchase price for the remainder interests in certain notes and contracts for deed that had purportedly become due or were about to become due under the Global Agreement. According to TNIG, Associates initially requested additional information regarding TNIG's claims and demands, but subsequently refused to respond to TNIG's demands.

## C.   The DOTPA Dispute

Disagreements between TNIG and Associates also arose in connection with the parties' rights and obligations under the terms of the DOTPAs. In December 2001, Associates engaged Grand Servicing Corporation ("Grand") to service the partial interests owned by Associates, including the partial interests that Associates had purchased from TNIG. Soon after Associates hired Grand, Associates and Grand became aware of certain instances of fraud by sellers of partial interests in

8

seller-financed notes and contracts for deed. Examples of such fraud included instances in which the seller did not own some or all of the partial interest that it sold, despite representations to the contrary, as well as instances in which the seller claimed that it was entitled to receive proceeds for a paid-off partial interest or that it was entitled to reassignment of a note or contract following the expiration of Associates' partial interest when, in reality, the seller had previously transferred the remainder interest to a third party. None of the fraudulent transactions involved TNIG. However, after learning of the fraud, a Citigroup attorney instructed Grand to begin verifying: (1) that any person or entity to whom it reassigned a note or contract for deed following the expiration of Associates' partial interest actually owned the remainder interest in the note or contract; (2) that any person or entity to whom Grand paid excess funds, if any, remaining following a foreclosure sale or following an early payment in full of the note or contract for deed actually owned the remainder interest in the note or contract; and (3) that all persons or entities that were entitled to receive any portion of the excess funds remaining after a foreclosure sale or following an early pay off of the note or contract for deed actually received payment. Grand applied the verification procedures to all partial interests owned by Associates, not just those that Associates purchased from TNIG.

Following the implementation of the verification procedures, whenever Grand received proceeds from an early payoff of a note or contract for deed or from a foreclosure sale involving property securing a note or contract for deed, Grand paid Associates its Guaranteed Yield or Foreclosure Minimum out of the proceeds, as required under the DOTPAs. However, before Grand paid any proceeds in excess of the Guaranteed Yield or Foreclosure Minimum (collectively, "excess proceeds") to TNIG, Grand began requiring TNIG to provide Grand with sufficient documentation, such as TNIG's purchase agreement with its seller, to verify that TNIG was, in fact, the owner of the remainder interest in the note or contract for deed. Similarly, whenever Associates' partial interest in a note or contract for deed paid out (i.e., all monthly payments under Associates' partial interest were paid by the borrower as they became due), Grand began requiring TNIG to provide documentation sufficient to verify that TNIG was still the owner of the remainder interest before Associates would reassign the remainder interest back to TNIG.

When TNIG received Grand's requests for documentation, TNIG provided the requested documentation to the extent it had the documentation in its files. TNIG, however, did not have a purchase agreement with its seller for every account, and in many cases, TNIG was unable to provide documentation sufficient

10

to satisfy Grand that TNIG owned the entirety of the remainder interest in a note or contract. To complicate matters further, Grand realized over time that although a copy of the purchase agreement between TNIG and its seller was sufficient to verify whether TNIG had initially purchased the entirety of the note or contract for deed from its seller (and, thus, that TNIG owned the remainder interest in the note or contract at the time it entered into the DOTPA with Associates), it was not sufficient to verify that TNIG had paid its seller the second installment under the purchase agreement and, therefore, that TNIG was the only entity with a claim to the excess proceeds under the DOTPAs. The purchase agreement between TNIG and its seller was also not sufficient to verify that TNIG still owned the remainder interest and had not assigned the remainder interest back to its seller or to a third party since entering into the DOTPA with Associates. Therefore, in certain cases, even when TNIG provided Grand with a copy of the purchase agreement between TNIG and its seller, Grand nevertheless required TNIG to provide additional documentation, such as a release, a cancelled check showing that TNIG had paid its seller the second installment under the purchase agreement, or a written statement from TNIG indicating whether it had paid the second installment to its seller, before Grand would release the excess proceeds to TNIG or its sellers under the DOTPAs.

11

Initially, in some cases, Grand was able to obtain documentation sufficient to verify that TNIG owned the remainder interest in the note or contract for deed and that TNIG still owed the second installment payment under its purchase agreement with its seller. In those cases, if Grand was able to verify the amount that TNIG owed to its seller for the second installment payment, Grand released the excess proceeds in the form of two checks: one to TNIG's seller for the amount of the second installment payment, and one to TNIG for the rest of the excess proceeds.

However, Grand's representative testified that as time went on, TNIG became less cooperative and less willing to comply with Grand's verification requests. In cases in which Grand was able to determine that TNIG still owned the remainder interest in a note or contract for deed, but was unable to verify the amount, if any, that TNIG still owed to its seller, Grand attempted to disperse the excess proceeds by issuing a joint check made payable to both TNIG and its seller for the total amount of the excess proceeds. TNIG, however, refused to accept payment in the form of the joint checks it received from Grand.

Eventually, Grand began placing all excess proceeds for paid-off accounts and accounts involving foreclosure sales in a non-interest bearing escrow account (the "Escrow Account"), rather than releasing those funds to TNIG or to TNIG's

12

sellers. Likewise, to the extent any accounts paid out (i.e., Associates collected all payments due under its partial interest), Grand did not reassign the note or contract for deed back to TNIG following the expiration of Associates' partial interest, but instead continued to collect monthly payments under the notes or contracts for deed and placed those payments in the Escrow Account. At trial, Grand's representative testified that the excess proceeds and payments for paid-out accounts were placed in the Escrow Account "for safekeeping, until such time as [Grand] would gather enough documentation to ascertain where they should be dispersed."

## II.    Procedural Background

On August 14, 2006, TNIG filed suit against Associates. In its pleadings, TNIG asserted claims against Associates for breach of contract, fraud, conversion, and unjust enrichment arising out of Associates' failure to make second funding payments under the alleged Global Agreement (the "Global Agreement Claims").[3] TNIG sought actual damages in the amount of $917,260, which TNIG claimed was equal to the aggregate amount of the alleged second funding payments due under the Global Agreement, plus attorney's fees and exemplary damages. In October

_____

[3] TNIG also asserted a claim for violations of the Texas Deceptive Trade Practices-Consumer Protection Act, which TNIG subsequently removed from its pleadings.

2009, TNIG nonsuited its claims against Associates in that lawsuit and filed a virtually identical lawsuit against Associates on December 21, 2009.[4]

On May 13, 2011, Associates filed a traditional and no-evidence motion for summary judgment on the Global Agreement Claims. In its motion, Associates argued, among other things, that it was entitled to summary judgment because: (1) no Global Agreement existed between TNIG and Associates; (2) even if it was assumed that the Global Agreement existed, it was unenforceable under the statute of frauds; (3) the admission of evidence regarding the alleged Global Agreement was barred by the parol evidence rule; and (4) TNIG's claims for fraud, conversion, and unjust enrichment arising out of the Global Agreement were barred by the economic loss rule. TNIG filed its response to Associates' summary judgment motion on June 2, 2011.

On June 6, 2011, prior to any ruling by the trial court on Associates' motion for summary judgment, Associates filed a "Declaration of Settlement Offer" pursuant to Texas Rule of Civil Procedure 167. Four days later, on June 10, 2011, Associates sent TNIG a written settlement offer, in which Associates offered to

---

[4] The record reflects that when TNIG non-suited its initial lawsuit against Associates, the parties entered into a Rule 11 agreement in which they agreed, for purposes of limitations, that any suit filed thereafter by TNIG and Associates involving the same claims would be treated as filed on the date the initial lawsuit was filed. Further, the parties agreed that all discovery conducted during the initial lawsuit could be used in any new proceeding.

pay TNIG the aggregate sum of $350,000 in exchange for a dismissal and release of TNIG's claims. It is undisputed that TNIG did not accept the offer.

On June 22, 2011, TNIG filed its third amended petition, in which it alleged, for the first time, claims against Associates for breach of contract, conversion, and exemplary damages arising out of the individual DOTPAs (the "Individual DOTPA Claims"). In particular, TNIG alleged that Associates breached the individual DOTPAs by failing to pay TNIG proceeds in excess of those to which Associates was entitled under the DOTPAs. Additionally, TNIG alleged that Associates converted funds owed to TNIG by continuing to collect and retain payments for notes and contracts for deed after Associates had collected all payments to which it was entitled under the terms of the DOTPAs. TNIG's newly-asserted claims were essentially based on the theory that Associates violated the terms of the DOTPAs by failing to pay to TNIG: (1) all amounts in excess of Associates' Guaranteed Yield for notes and contracts for deed that were paid off in full during Associates' partial interest, (2) all amounts in excess of Associates' Foreclosure Minimum for notes and contracts for deed involving a foreclosure sale, and (3) all monthly payments collected by Associates for paid-out accounts following the expiration of Associates' partial interest.

On June 24, 2011, the trial court held a hearing on Associates' motion for summary judgment on the Global Agreement Claims. On July 8, 2011, the trial court entered an order denying that motion.

On July 21, 2011, Associates sent a letter and check in the amount of $174,562.50 to TNIG. In the letter, Associates explained that the $174,562.50 represented all amounts being held by Grand in the Escrow Account for paid-off and paid-out accounts, plus interest on those amounts from the date each payment was received through July 22, 2011.[5] It also explained that the $174,562.50 represented Associates' tender of all amounts owed to TNIG for the Individual DOTPA Claims as of the date of the tender. TNIG received the tender letter and check on July 22, 2011, but ultimately returned the check to Associates on September 7, 2011, with a letter stating that TNIG had rejected Associates' tender of funds.

Thereafter, the trial court entered a docket control order setting the case for trial on January 23, 2012. At the docket call on January 20, 2012, the trial judge informed the parties that he had again reviewed Associates' May 13, 2011 motion for summary judgment on the Global Agreement Claims, as well as TNIG's

---

[5] Although Associates' July 21, 2011 letter described the tender as only including amounts withheld for paid-off and paid-out accounts, plus interest, the record reflects that the tender also included amounts withheld by Grand for at least one account in which the subject property was sold in foreclosure.

16

response thereto, and had decided to grant the motion. Accordingly, on January 20, 2012, the trial judge signed an order granting summary judgment in favor of Associates on the Global Agreement Claims and stating that the only claims remaining in the lawsuit were TNIG's "causes of action for conversion and breach of contract to recover any proceeds received and held by [Associates] in excess of [Associates'] entitlement under the individual [DOTPAs]."

On January 23, 2012, the case was called to trial and a jury was impanelled. On January 25, 2012, the third day of trial, the trial court declared a mistrial and dismissed the jury. Additionally, the trial court ordered Associates to deposit the $174,562.50 that it had tendered to TNIG on July 21, 2011, into the registry of the court. The record indicates that Associates tendered the $174,562.50 into the registry of the court on February 2, 2012.

On June 1, 2012, Associates filed a motion for partial summary judgment, asserting that limitations barred a portion of TNIG's remaining breach of contract and conversion claims. On July 10, 2012, the trial court signed an order granting in part and denying in part the June 1, 2012 partial summary judgment motion.

On July 10, 2012, the case proceeded to trial before the bench. At trial, TNIG presented evidence in support of its remaining breach of contract and conversion claims arising out of the individual DOTPAs for twenty-five notes and

17

contracts for deed. At the close of evidence, the trial court requested briefing from the parties regarding TNIG's right to recover attorney's fees under section 38.002 of the Texas Civil Practice and Remedies Code. After both parties submitted trial briefs on the issue of TNIG's attorney's fees, the trial court entered an order on July 18, 2012, denying TNIG's request for attorney's fees under Texas Civil Practice & Remedies Code § 38.002.

On August 24, 2012, the trial court rendered its final judgment. The trial court's judgment provided that TNIG was entitled to an award of damages against Associates in the aggregate amount of $131,876.85, inclusive of interest. However, the judgment further provided that under Texas Rule of Civil Procedure 167.4, Associates was entitled to an award of litigation costs in the amount of $65,938.42, which was to be applied as an offset against TNIG's recovery. Accordingly, the trial court ordered that $65,938.43 be paid to TNIG as its net recovery on its claims against Associates and that $65,938.42 be paid to Associates for its litigation costs under Rule 167. The trial court ordered that both TNIG's net recovery and Associates' award of litigation costs would be paid out of the funds tendered by Associates into the registry of the court. At TNIG's request, the trial court entered findings of fact and conclusions of law. TNIG then timely filed its notice of appeal.

### III.  Issues Presented

TNIG presents three issues on appeal. In its first issue, TNIG argues that the trial court erred by awarding litigation costs to Associates under Texas Rule of Civil Procedure 167 because the Individual DOTPA Claims had not been pled by TNIG at the time Associates made its settlement offer under Rule 167 and, thus, were not claims by and against Associates, as required to be included in a settlement offer under that rule. TNIG argues that because Associates' settlement offer did not include the claims that ultimately formed the basis of the trial court's judgment, Associates was not entitled to an award of litigation costs under Rule 167. In its second issue, TNIG argues that the trial court erred in concluding that the letter and check sent by Associates to TNIG on July 21, 2011, constituted a valid tender of funds for the Individual DOTPA Claims, thereby precluding TNIG from recovering attorney's fees under Chapter 38 of the Texas Civil Practice and Remedies Code and interest following the date of the tender. In its third issue, TNIG argues that the trial court erred in reconsidering and granting Associates' May 13, 2011 motion for summary judgment on the Global Agreement Claims after previously denying such motion and failing to provide notice to TNIG that the motion would be reconsidered.

## IV. Litigation Costs

In its first point of error, TNIG argues that the trial court erred by awarding litigation costs to Associates under Texas Rule of Civil Procedure 167. Specifically, TNIG argues that the language of Rule 167 limits the claims that may be included in a settlement offer under that rule to claims that have been formally pled at the time the settlement offer is made. TNIG contends that because it had not yet pled the Individual DOTPA Claims at the time Associates made its settlement offer under Rule 167, the settlement offer could not and did not include those claims.[6] TNIG argues that because Associates' settlement offer did not include the claims that ultimately formed the basis of the trial court's judgment, Associates was not entitled to an award of litigation costs under Rule 167.

Chapter 42 of the Texas Civil Practice and Remedies Code governs the award of litigation costs against a party who rejects an offer of settlement made in accordance with its provisions. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 42.001-.005 (West 2015). Under Chapter 42, if a settlement offer is made and rejected, and

---

[6] In the section of its brief entitled "Summary of the Argument," TNIG casts its first point of error as a challenge to the legal and factual sufficiency of the evidence supporting the trial court's award of litigation costs to Associates under Rule 167. However, upon reviewing the substance of TNIG's arguments for this issue, we conclude that TNIG is actually challenging the trial court's construction of Rule 167, as well as its interpretation of the language contained in Associates' offer of settlement under that rule.

the judgment ultimately proves to be significantly less favorable to the rejecting party than the settlement offer, then the offering party shall recover litigation costs from the rejecting party from the time the offer was rejected to the time of judgment. *Id*. § 42.004(a), (c). The purpose of the offer of settlement mechanism set forth in Chapter 42 is to reduce the cost of litigation in certain cases by providing an incentive for litigants to make and accept reasonable settlement offers early in the litigation process. *In re CompleteRX, Ltd.*, 366 S.W.3d 318, 321-22 (Tex. App.—Tyler 2012, orig. proceeding); *see also Amedisys, Inc. v. Kingwood Home Health Care, LLC*, 437 S.W.3d 507, 513 (Tex. 2014) (noting that "Texas has a public policy preference for the settlement of legal disputes" and that "chapter 42 and rule 167 encourage such settlements").

When the Legislature created the offer of settlement mechanism in Chapter 42, it directed the Texas Supreme Court to promulgate rules providing the procedural details for its implementation. *See* Tex. Civ. Prac. & Rem. Code Ann. § 42.005. In response, the Court adopted Texas Rule of Civil Procedure 167. *See* Tex. R. Civ. P. 167.1-.7; *CompleteRX*, 366 S.W.3d at 322. Rule 167.2(a) specifies how the settlement offer provision is to be invoked:

> (a) *Defendant's declaration a prerequisite; deadline*. A settlement offer under this rule may not be made until a defendant – a party against whom a claim for monetary damages is made – files a declaration invoking this rule. When a defendant files such a

21

declaration, an offer or offers may be made under this rule to settle only those claims by and against that defendant. The declaration must be filed no later than 45 days before the case is set for conventional trial on the merits.

Tex. R. Civ. P. 167.2(a). Rule 167.2(b), in turn, sets forth the requirements with which a settlement offer made under the rule must comply:

(b) *Requirements of an offer*. A settlement offer must:

(1) be in writing;

(2) state that it is made under Rule 167 and Chapter 42 of the Texas Civil Practice and Remedies Code;

(3) identify the party or parties making the offer and the party or parties to whom the offer is made;

(4) state the terms by which all monetary claims – including any attorney fees, interest, and costs that would be recoverable up to the time of the offer – between the offeror or offerors on the one hand and the offeree or offerees on the other may be settled;

(5) state a deadline – no sooner than 14 days after the offer is served – by which the offer must be accepted;

(6) be served on all parties to whom the offer is made.

*Id*. 167.2(b).

Similar to Chapter 42, Rule 167.4(a) provides that if a settlement offer made under the rule "is rejected, and the judgment to be awarded on the monetary claims covered by the offer is significantly less favorable to the offeree than was the offer, the court must award the offeror litigation costs against the offeree from the time

22

the offer was rejected to the time of judgment." *Id*. 167.4(a). Rule 167.4(b) states that "[a] judgment award on monetary claims is significantly less favorable than an offer to settle those claims if: (1) the offeree is a claimant and the judgment would be less than 80 percent of the offer; or (2) the offeree is a defendant and the judgment would be more than 120 percent of the offer." *Id*. 167.4(b). Litigation costs awarded to a defendant under Rule 167 "must be made a setoff to the claimant's judgment against the defendant." *Id*. 167.4(g).

TNIG argues that at the time Associates made its settlement offer on June 10, 2011, TNIG had not yet filed its third amended petition adding the Individual DOTPA Claims. Rather, TNIG points out, the live pleading on file for TNIG at the time the settlement offer was made was TNIG's second amended petition, which included only the Global Agreement Claims. TNIG argues that because the Individual DOTPA Claims were not formally pled by TNIG until June 22, 2011—twelve days after Associates made its Rule 167 settlement offer—the Individual DOTPA Claims were not "claims by and against" Associates at the time the settlement offer was made and thus could not, as a matter of law, be included in the settlement offer under the express language of Rule 167.2(a). Essentially, TNIG argues that the phrase "claims by and against that defendant," as used in Rule

23

167.2(a), means only those claims that have been formally pled by and against the defendant at the time the settlement offer is made.

Associates, on the other hand, argues that nothing in the language of Rule 167 requires claims to be expressly pled in the parties' pleadings in order to constitute "claims by and against that defendant" under Rule 167.2(a). Instead, Associates contends that the phrase "claims by and against that defendant" was intended to include both pled and unpled claims. Associates argues that any other interpretation would frustrate the intent behind the rule.

The resolution of this issue requires us to interpret Rule 167.2(a). The construction of a procedural rule is a question of law that is subject to de novo review. *See Thomas v. Olympus/Nelson Prop. Mgmt.*, 148 S.W.3d 395, 399 (Tex. App.—Houston [14th Dist.] 2004, no pet.). We apply the same rules of construction to procedural rules that we apply to the interpretation of statutes. *Ford Motor Co. v. Garcia*, 363 S.W.3d 573, 579 (Tex. 2012). In construing a rule of procedure, our primary objective is to determine and give effect to the rule's intent. *See Thomas*, 148 S.W.3d at 399. To accomplish this goal, "[w]e first look to the plain language of the rule[.]" *Ford Motor Co.*, 363 S.W.3d at 579. We must examine the rule as a whole, giving effect to every word, clause, and sentence. *See Tex. Adjutant Gen.'s Office v. Ngakoue*, 408 S.W.3d 350, 354 (Tex. 2013). If the

24

rule's language is clear and unambiguous, we interpret the rule according to its plain meaning unless a different meaning is apparent from the context or the plain meaning would lead to absurd results. *See In re Christus Spohn Hosp. Kleberg*, 222 S.W.3d 434, 437 (Tex. 2007); *Cadena Comercial USA Corp. v. Tex. Alcoholic Beverage Comm'n*, 449 S.W.3d 154, 162 (Tex. App.—Austin 2014, pet. filed). Further, the Texas Code Construction Act applies to the construction of procedural rules and, among other things, permits our consideration of the object sought to be attained by the rule, the circumstances under which the rule was enacted, and the consequences of a particular construction of the rule, regardless of whether the rule is ambiguous. *See* Tex. Gov't Code Ann. §§ 311.002(4), 311.023(1)-(2), (5) (West 2013); *see also Atmos Energy Corp. v. Cities of Allen*, 353 S.W.3d 156, 160 (Tex. 2011); *In re Walkup*, 122 S.W.3d 215, 217 (Tex. App.—Houston [1st Dist.] 2003, no pet.). We are also guided by the mandate of Rule 1, which requires us to liberally construe the Texas Rules of Civil Procedure to obtain a "just, fair, equitable[,] and impartial adjudication of the rights of litigants under established principles of substantive law" with "as great expedition and dispatch and at the least expense both to the litigants and to the state as may be practicable[.]" Tex. R. Civ. P. 1.

Based on the foregoing rules of construction, we begin our analysis by examining the plain language of the rule. *See Ford Motor Co.*, 363 S.W.3d at 579. As both parties note, Rule 167.2(a) expressly limits the types of claims that may be included in a settlement offer under Rule 167 to "claims by and against that defendant." Tex. R. Civ. P. 167.2(a). Rule 167 does not define the term "claims." *See* Tex. R. Civ. P. 167. Chapter 42, however, defines a "'[c]laim'" as "a request, including a counterclaim, cross-claim, or third-party claim, to recover monetary damages." Tex. Civ. Prac. & Rem. Code Ann. § 42.001(1). Because Rule 167 was adopted for the specific purpose of implementing the offer of settlement procedure set forth in Chapter 42, we find Chapter 42's definition of the term "claim" to be directly applicable here. *See* Tex. Gov't Code Ann. § 311.011(b) (West 2013) ("Words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly."). Nothing in Chapter 42's definition of the term "'[c]laim'" requires a request for monetary damages—whether it be a counterclaim, cross-claim, third-party claim, or otherwise—to be expressly pled in a party's pleadings at the time the settlement offer is made in order to constitute a "'[c]laim.'" *See* Tex. Civ. Prac. & Rem. Code Ann. § 42.001(1). To the contrary, the definition unambiguously encompasses any

26

request to recover monetary damages, regardless of whether such request is contained in a party's pleadings. *See id*.

The words "by" and "against" are also not defined by Rule 167, nor are they defined by Chapter 42. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 42.001-.005; Tex. R. Civ. P. 167.1-.7. Therefore, we construe those words in accordance with their ordinary and commonly understood meanings. *See Indem. Ins. Co. v. City of Garland*, 258 S.W.3d 262, 269 (Tex. App.—Dallas 2008, no pet.). The ordinary meaning of the word "by" is "through or through the medium of[.]" *By,* WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY (1988). The word "against" means "in opposition or hostility to[.]" *Against,* WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY (1988). Thus, when we construe those words according to their commonly accepted definitions, we find that claims are "by" a defendant if they are simply "through" that defendant and claims are "against" a defendant if they are "in opposition to" that defendant.

We also note that the word "that," as used in the phrase "claims by and against that defendant[,]" is used grammatically as a determiner, which is a word, such as "this," "that," "these," and "those," that "determines the use of a noun without actually modifying it." *See* RANDOM HOUSE WEBSTER'S GRAMMAR, USAGE, AND PUNCTUATION 66 (2008). When used as a determiner, "that"

27

commonly means the particular "person, thing, or idea indicated, mentioned, or understood from the situation[.]" *That,* WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY (1988). Here, the word "that" determines the use of the word "defendant." *See* Tex. R. Civ. P. 167.2(a). The only other references to the term "defendant" in Rule 167.2(a) are to the particular defendant that has filed the declaration invoking Rule 167. *Id.* Thus, when read contextually and in accordance with applicable grammatical rules, "that defendant" as used in Rule 167.2(a), unambiguously refers to the specific defendant that filed the declaration invoking Rule 167. *See* Tex. R. Civ. P. 167.2(a); *see also* Tex. Gov't Code Ann. § 311.011(a).

We conclude that the phrase "claims by and against that defendant" in Rule 167.2(a) is clear and unambiguous and, according to its plain language, limits the claims that may be included in a settlement offer under Rule 167 to (1) requests to recover monetary damages that are by (i.e., "through") the defendant that filed the declaration invoking Rule 167, and (2) requests to recover monetary damages that are against (i.e., "in opposition to") the defendant that filed the declaration invoking Rule 167. *See* Tex. R. Civ. P. 167.2(a). Contrary to TNIG's argument, nothing in the plain language of the rule indicates that a claim must be formally pled when the settlement offer is made in order to be included in a settlement offer

28

under the rule, and we decline to read any such requirement into those words when, as here, there is no indication in the language of the rule or otherwise that the Texas Supreme Court intended that we do so. *See Fitzgerald v. Advanced Spine Fixation Sys., Inc.*, 996 S.W.2d 864, 867 (Tex. 1999) (explaining that a court may not add words into a rule or statute unless truly extraordinary circumstances exist showing an unmistakable intent by the enacting body); *Young v. McKim*, 373 S.W.3d 776, 781 (Tex. App.—Houston [14th Dist.] 2012, pet. denied) (concluding that when construing a statute, a court should "presume words excluded from the statute were excluded purposefully").

Other provisions of Rule 167 support this interpretation. Specifically, Rule 167.2(d) identifies the types of claims that may not be included in a settlement offer under Rule 167. *See* Tex. R. Civ. P. 167.2(d). Rule 167.2(d) provides: "An offer must not include non-monetary claims and other claims to which this rule does not apply." *Id*. Rule 167.1, in turn, sets forth a list of claims to which Rule 167 does not apply, including claims in (a) class actions, (b) shareholder derivative actions, (c) actions by or against the State, a unit of state government, or a political subdivision of the State, (d) actions brought under the Family Code, (e) actions to collect workers' compensation benefits under title 5, subtitle A of the Labor Code, and (f) actions filed in justice of the peace courts or small claims courts. *See* Tex.

29

R. Civ. P. 167.1. Noticeably absent from both of these provisions are claims that have not been formally pled at the time the settlement offer is made. *See* Tex. R. Civ. P. 167.1, 167.2(d).

Further, we find that the language of Chapter 42 supports our interpretation of Rule 167.2(a). Section 42.002, which governs the applicability and effect of the offer of settlement statute, states in relevant part:

> (c) This chapter does not apply until a defendant files a declaration that the settlement procedure allowed by this chapter is available in the action. *If there is more than one defendant, the settlement procedure allowed by this chapter is available only in relation to the defendant that filed the declaration and to the parties that make or receive offers of settlement in relation to that defendant.*

Tex. Civ. Prac. & Rem. Code Ann. § 42.002(c) (emphasis added). Moreover, section 42.005, which directs the Texas Supreme Court to promulgate rules implementing the offer of settlement procedures set forth in Chapter 42, states that "[t]he rules promulgated by the supreme court must address actions in which there are multiple parties[.]" *Id.* § 42.005(c). Rule 167.2(a), which was promulgated in accordance with the directives set forth in section 42.005, largely follows the format and substance of section 42.002(c). *See* Tex. R. Civ. P. 167.2(a); *see also* Tex. Civ. Prac. & Rem. Code Ann. § 42.002(c). By contrast, we find nothing in the language of Chapter 42 suggesting that the intended purpose of the phrase "claims by and against that defendant" is, as TNIG contends, to limit the claims that may

30

be included in a settlement offer to those that have been specifically pled by and against a defendant at the time the settlement offer has been made. Thus, the language of Chapter 42 reinforces the conclusion that the intended purpose of the phrase "claims by and against that defendant" in Rule 167.2(a) is to limit the claims that may be included in a settlement offer to claims pertaining to the specific defendant that filed the declaration invoking Rule 167, and not, as TNIG suggests, to limit the claims in a settlement offer to those that have been formally pled at the time the settlement offer is made.

TNIG argues that the language of Rule 167.2(b)(4) supports its interpretation that a settlement offer under Rule 167 may only include claims that have been pled by or against a defendant at the time the settlement offer is made. Rule 167.2(b)(4) states that a settlement offer must "state the terms by which all monetary claims – including any attorney fees, interest, and costs that would be recoverable up to the time of the offer – between the offeror or offerors on the one hand and the offeree or offerees on the other may be settled[.]" Tex. R. Civ. P. 167.2(b)(4). TNIG argues that the phrase "that would be recoverable up to the time of the offer" in Rule 167.2(b)(4) indicates that "the only thing the [d]efendant can try to settle in a suit where it has invoked [Rule] 167 is a monetary claim that would have been recoverable by [the] plaintiff at the time of the offer." TNIG's argument

31

necessarily assumes that the phrase "that would be recoverable up to the time of the offer" in Rule 167.2(b)(4) modifies the term "all monetary claims[.]" We disagree with that assumption.

The language on which TNIG relies—"that would be recoverable up to the time of the offer"—is part of the larger phrase "including any attorney fees, interest, and costs that would be recoverable up to the time of the offer." Tex. R. Civ. P. 167.2(b)(4). The word "'including[,]'" which is a term of enlargement and not limitation, typically introduces a non-exhaustive list of components that are part of a larger whole. *See* Tex. Gov't Code Ann. § 311.005(13) (West 2013). As used in Rule 167.2(b)(4), the word "including" introduces a non-exhaustive list of categories of monetary claims—"attorney fees, interest, and costs"—that are part of a larger whole—"all monetary claims[.]" *See* Tex. R. Civ. P. 167.2(b)(4). This non-exhaustive list is syntactically separated from the rest of the sentence, including the phrase "all monetary claims[,]" by dashes. *Id.*

The phrase "that would be recoverable up to the time of the offer" immediately follows the words "attorney fees, interest, and costs[]" and is likewise included in the portion of the sentence that is set off by dashes. *Id.* As used in Rule 167.2(b)(4), the phrase "that would be recoverable up to the time of the offer" is an adjective clause, which, by definition, modifies a noun or pronoun. *See id.*;

32

RANDOM HOUSE WEBSTER'S GRAMMAR, USAGE, AND PUNCTUATION at 97. It is a general rule of grammar that modifying words or phrases are presumed to apply to the words or phrases that immediately precede them and not to those more remote. *See Tex. West Oaks Hosp., LP v. Williams*, 371 S.W.3d 171, 184 (Tex. 2012) ("'Modifiers should come, if possible, next to the words they modify.'" (quoting WILLIAM STRUNK, JR. & E.B. WHITE, THE ELEMENTS OF STYLE R. 30 (4th ed. 2000))); *see also* BRYAN A. GARNER, GARNER'S MODERN AMERICAN USAGE 540 (3d ed. 2009) (noting that "[w]hen modifying words are separated from the words they modify, readers have a hard time processing the information" and that "the true referent should generally be the closest appropriate word[.]"); H. RAMSEY FOWLER, THE LITTLE, BROWN HANDBOOK 147 (2d ed. 1983) ("Adjective clauses ordinarily fall immediately after the noun or pronoun they modify."). This rule is related to the last antecedent doctrine of statutory interpretation, which provides that "a qualifying phrase should be applied only to the portion of the sentence 'immediately preceding it.'" *Williams*, 371 S.W.3d at 185 (quoting *City of Dallas v. Stewart*, 361 S.W.3d 562, 571 n.14 (Tex. 2012)).

Applying this rule, the clause "that would be recoverable up to the time of the offer" modifies only the words immediately preceding it—"attorney fees, interest, and costs"—and not the more remote phrase "all monetary claims." *See*

33

Tex. R. Civ. P. 167.2(b)(4). This interpretation is supported by the location of the dashes in the sentence, which effectively limit the reach of the modifying clause "that would be recoverable up to the time of the offer" to the words "attorney fees, interests, and costs," which, like the modifying clause, are located within the part of the sentence set off by the dashes. *See id*. Rule 167.2(b)(4), therefore, does not support TNIG's construction of Rule 167.2(a).

Having concluded that Rule 167.2(a) does not prohibit a settlement offer from including unpled claims, we now examine whether the trial court correctly concluded that Associates' settlement offer under Rule 167 included the Individual DOTPA Claims that ultimately formed the basis of the trial court's judgment. The record reflects that Associates attached a copy of its June 10, 2011 settlement offer as an exhibit to its motion for litigation costs under Rule 167. The settlement offer states, in relevant part, as follows:

> Defendant [Associates] has submitted to the Court a Declaration of Settlement Offer regarding Associates' intent to submit to Plaintiff [TNIG] an offer of settlement pursuant to Rule 167 of the Texas Rules of Civil Procedure. This letter constitutes that offer. This offer is being made pursuant to Rule 167 of the Texas Rules of Civil Procedure and Chapter 42 of the Texas Civil Practice & Remedies Code. This offer is being made on behalf of Associates and being made to TNIG.
>
> Associates hereby offers to pay to TNIG the aggregate sum of $350,000.00 (the "Settlement Sum") in full and complete satisfaction of *all monetary claims of TNIG against Associates*, including claims

34

for attorney's fees, costs and interests [sic], if any, that would be recoverable up to the date hereof. Pursuant to Rule 167.2(c), the only conditions to such offer are (1) a dismissal of *the claims asserted by TNIG against Associates* with prejudice, (2) a release by TNIG of Associates, its employees, agents, officers, directors, and representatives, including any servicer acting on behalf of Associates, from *any and all claims asserted or assertable by TNIG in the pending lawsuit or which pertain in any way to any of the contracts for deed, mortgages, and transactions which are the subject of the pending lawsuit*[,] and (3) TNIG's agreement to indemnify Associates and its representatives, including any servicer acting on behalf of Associates, from any loss, injury, damage, or cost (including attorney's fees) suffered or incurred in connection with any claim by any seller to TNIG of any of the contracts for deed or mortgages which are the subject of the pending lawsuit.

(Emphasis added). The settlement offer expressly states that it applies to "all monetary claims of TNIG against Associates[.]" It further states that it is conditioned upon a dismissal of "the claims asserted by TNIG against Associates" and TNIG's execution of a release of Associates "from any and all claims asserted or assertable by TNIG in the pending lawsuit or which pertain in any way to any of the contracts for deed, mortgages, and transactions which are the subject of the pending lawsuit[.]"

TNIG does not contend, and we do not find, that Associates' settlement offer under Rule 167 is ambiguous. "The construction of an unambiguous writing is a question of law." *Ins. Corp. of Am. v. Webster*, 906 S.W.2d 77, 80-81 (Tex. App.—Houston [1st Dist.] 1995, writ denied). When a writing is unambiguous, effect will

35

be given to the objective intention of the party or parties as expressed within the writing. *Boyd v. Am. Bank of Commerce at Wolfforth*, 872 S.W.2d 29, 31 (Tex. App.—Amarillo 1994, writ dism'd by agr.).

In *Amedisys, Inc.*, the Texas Supreme Court analyzed the language of a settlement offer made under Rule 167 to determine, *inter alia*, whether the offer was intended to include claims that had not yet been asserted. 437 S.W.3d at 515. In that case, the defendant sent the plaintiff a settlement offer under Rule 167, which stated in relevant part:

> Please accept this letter as an offer of settlement regarding the above referenced matter. Specifically, my client, [Kingwood] makes this offer to pay your client, [Amedisys] to settle *all monetary claims between the parties* in accordance with Texas Civil Practice & Remedies Code Chapter 42 and Texas Rule of Civil Procedure 167.
>
> . . .
>
> [Kingwood] offers to settle with Amedisys the following claims in accordance with Texas Civil Practice & Remedies Code Chapter 42 and Texas Rule of Civil Procedure 167:
>
> [Kingwood] offers a total sum of $90,000 to settle *all claims asserted or which could have been asserted* by Amedisys against [Kingwood] in the above referenced case. This full and final offer is for *all monetary damages claimed*—including attorney[']s fees, costs and interest that were recoverable as of the date of this offer by [Kingwood]. A lump-sum payment in the amount of $90,000 will be made by [Kingwood] within fifteen (15) days after acceptance. If your client agrees, please indicate so by affixing your signature below and returning to me.

36

*Id*. at 514-15. One of the questions before the Court was whether the defendant's settlement offer was intended to settle all claims between the plaintiff and the defendant, including claims that had not yet been asserted, or whether it was only intended to settle the claims that had been asserted by the parties. *Id*. at 514-17. After analyzing the language of the settlement offer, the Court concluded that the offer was intended to settle all claims between the plaintiff and the defendant, including claims that had not yet been asserted. *Id*. at 515. In reaching this conclusion, the Court first noted that the defendant's settlement offer was itself internally inconsistent in its descriptions of the claims that the defendant was offering to settle. *Id*. It observed that the settlement offer initially offered to settle "'all monetary claims between the parties,'" which omitted any explicit reference to claims that could have been asserted. *Id*. It then described the claims as "'all claims asserted or which could have been asserted,'" which clearly included claims not yet asserted. *Id*. But it subsequently stated that "'the offer is for all monetary damages asserted,'" omitting any reference to damages not asserted. *Id*. Despite these inconsistencies, the Court concluded that, based on the second description of "'all claims asserted or which could have been asserted,'" the settlement offer was intended to settle all claims, including any claims that had not been asserted. *Id*. In doing so, it interpreted the first and third descriptions ("'claims between the

parties'" and "'damages asserted'") as shorthand references to the second description. *Id*.

We find the Court's analysis of the settlement offer in *Amedisys* to be instructive here. Similar to the settlement offer in *Amedisys*, Associates' settlement offer initially offers to settle "all monetary claims of TNIG against Associates[.]"Although this description omits any explicit reference to claims that could have been asserted by TNIG, nothing in that language excludes such claims. To the contrary, we find that the broad phrase "all monetary claims of TNIG against Associates[]" can reasonably be interpreted to include both asserted and unasserted monetary claims by TNIG against Associates. In the next sentence, Associates' settlement offer requests a dismissal of "the claims asserted by TNIG against Associates[,]" but this language is not determinative of the issue since there would be no need for the court to enter a dismissal of claims that had not been asserted. The settlement offer then requests TNIG, as part of the proposed settlement, to release Associates from "any and all claims asserted or assertable by TNIG in the pending lawsuit or which pertain in any way to any of the contracts for deed, mortgages, and transactions which are the subject of the pending lawsuit[.]" This third description clearly includes claims that have actually been asserted by TNIG and claims that are "assertable"—that is, claims that have not

38

been, but could be, asserted—by TNIG in the pending lawsuit. It also expressly includes claims by TNIG that pertain in any way to any of the contracts for deed, mortgages, and transactions that are the subject of the pending lawsuit. This description ("any and all claims asserted or assertable by TNIG in the pending lawsuit or which pertain in any way to any of the contracts for deed, mortgages, and transactions which are the subject of the pending lawsuit") is the most detailed description of the claims that Associates was offering to settle. Based on this description, we conclude that Associates' settlement offer was intended to settle all monetary claims by TNIG against Associates, including (i) claims that were actually asserted by TNIG in the pending lawsuit, (ii) claims that could have been asserted by TNIG in the pending lawsuit, and (iii) all claims pertaining in any way to the contracts for deed, mortgages, and transactions that are the subject of the pending lawsuit. *See Amedisys*, 437 S.W.3d at 515.

TNIG's third amended petition reflects that the Individual DOTPA Claims are claims by TNIG for monetary relief against Associates. Although TNIG had not yet asserted the Individual DOTPA Claims in its pleadings when Associates made its settlement offer under Rule 167, the record establishes that each of the Individual DOTPA Claims that forms the basis of the trial court's judgment constituted a claim that pertained to the contracts for deed, mortgages, and

transactions that were the subject of TNIG's Global Agreement Claims or that otherwise could have been asserted by TNIG in the pending lawsuit at the time the settlement offer was made. *See* Tex. R. Civ. P. 51(a) ("The plaintiff in his petition . . . may join either as independent or as alternate claims as many claims either legal or equitable or both as he may have against an opposing party."). Accordingly, we conclude that Associates' June 10, 2011 settlement offer under Rule 167 included each of the Individual DOTPA Claims that form the basis of the trial court's judgment. We overrule TNIG's first issue.

## V. Validity of the Tender

In its second point of error, TNIG argues that the trial court erred by concluding that the letter and check that Associates sent to TNIG on July 21, 2011, constituted a valid tender with respect to the Individual DOTPA Claims, thereby precluding TNIG from recovering attorney's fees under Chapter 38 of the Texas Civil Practice and Remedies Code and from recovering interest accruing after the date of the tender. Specifically, TNIG argues that: (1) the tender was not made within the thirty-day period following TNIG's presentment of its claim, (2) the tender was conditional, and (3) the tender was not for the correct amount owed. Thus, TNIG contends, Associates' purported tender did not operate to cut off TNIG's right to attorney's fees and interest for the Individual DOTPA Claims, and

the trial court's denial of attorney's fees and interest accrued after the date of the tender should be reversed.

Before we reach the merits of TNIG's arguments under its second point of error, we note that Texas Rule of Civil Procedure 167.4(f) states that "[a] party against whom litigation costs are awarded may not recover attorney fees and costs under another law incurred after the date the party rejected the settlement offer made the basis of the award." Tex. R. Civ. P. 167.4(f). Here, the record reflects that TNIG rejected Associates' settlement offer under Rule 167 when TNIG failed to accept the offer by June 27, 2011—the deadline given for TNIG to accept the offer. *See* Tex. R. Civ. P. 167.3(c). Because the trial court concluded that Associates was entitled to an award of litigation costs against TNIG under Rule 167 and because we have resolved each of TNIG's challenges to that award against it on appeal, Rule 167.4(f) precludes TNIG from recovering, under Chapter 38 or otherwise, any attorney's fees that it incurred in this case after June 27, 2011. *See id*. 167.4(f). However, because TNIG challenges the trial court's denial of all attorney's fees and interest it incurred in connection with its claims for breach of the individual DOTPAs, and not just the attorney's fees it incurred after the date that it rejected Associates' Rule 167 settlement offer, we address the arguments made by TNIG in its second point of error.

Section 38.001 of the Texas Civil Practice and Remedies Code permits a party to "recover reasonable attorney's fees . . . in addition to the amount of a valid claim and costs, if the claim is for . . . an oral or written contract." Tex. Civ. Prac. & Rem. Code Ann. § 38.001(8) (West 2015). To recover attorney's fees under that section: "(1) the claimant must be represented by an attorney; (2) the claimant must present the claim to the opposing party or to a duly authorized agent of the opposing party; and (3) payment for the just amount owed must not have been tendered before the expiration of the 30th day after the claim is presented." *Id*. § 38.002. As a general rule, the party seeking to recover attorney's fees carries the burden of proof to show its entitlement to the fees. *Smith v. Patrick W.Y. Tam Trust*, 296 S.W.3d 545, 547 (Tex. 2009). "If attorney's fees are proper under section 38.001(8), the trial court has no discretion to deny them." *Id*.

A proper tender of the just amount owed is a defense to a claim for attorney's fees under Chapter 38. *See Staff Indus., Inc. v. Hallmark Contracting, Inc*., 846 S.W.2d 542, 548 (Tex. App.—Corpus Christi 1993, no writ). It is also a defense to a claim for interest on the obligation accruing after the tender. *Id*. at 549. If the defendant tenders payment for the full amount owed, and the plaintiff refuses to accept it and proceeds to trial, the defendant is not liable for the

42

plaintiff's attorney's fees and subsequent interest. *Thomas v. Thomas*, 917 S.W.2d 425, 438 (Tex. App.—Waco 1996, no writ); *Staff Indus.*, 846 S.W.2d at 548.

## A. Timeliness of the Tender

TNIG first argues that Associates' July 21, 2011 tender did not constitute a valid tender of funds because the tender was not made within thirty days following the presentment by TNIG of its claims for breach of the individual DOTPAs.[7] Specifically, TNIG argues that presentment of its claims for breach of the individual DOTPAs can be traced back to 2008 when TNIG propounded, and Associates served its answers to, TNIG's first set of interrogatories. TNIG contends that because the presentment of its claims occurred nearly three years before Associates' July 21, 2011 tender, the tender was not timely and did not operate to cut off TNIG's right to recover attorney's fees under Chapter 38. Associates, by contrast, argues that TNIG's first set of interrogatories and Associates' answers thereto did not constitute presentment by TNIG of its claims

---

[7]As Associates correctly points out in its brief, TNIG's argument that the tender was invalid because it was not made within thirty days of presentment of its claims for breach of the individual DOTPAs pertains only to TNIG's challenge to the trial court's denial of attorney's fees under Chapter 38, and not to its challenge to the trial court's denial of interest following the date of the tender. The requirement that a defendant tender the just amount owed within thirty days of presentment of a claim is set forth in section 38.002 of the Texas Civil Practice and Remedies Code, which governs a claimant's entitlement to attorney's fees, not interest. *See* Tex. Civ. Prac. & Rem. Code Ann. § 38.002.

for breach of the individual DOTPAs and that the first time TNIG demanded payment of or asserted a claim to recover the funds held in the Escrow Account was when TNIG filed its third amended petition on June 22, 2011.

The trial court concluded that "[t]here was no presentment by TNIG of its claims on or before June 22, 2011." The trial court, therefore, implicitly concluded that TNIG's first set of interrogatories and Associates' answers to those interrogatories, served in 2008, did not constitute presentment of TNIG's claims for breach of the individual DOTPAs. The parties on appeal do not dispute the date that Associates served its answers to TNIG's first set of interrogatories, the date of the tender, or the content of the interrogatories and Associates' answers thereto. Rather, the limited issue, as briefed by the parties, is whether the specific interrogatory at issue and its answer, together, constituted presentment of TNIG's claims for breach of the individual DOTPAs so as to make Associates' July 21, 2011 tender of funds untimely for purposes of section 38.002. Because this issue turns principally on the application of section 38.002 to undisputed facts, it presents a question of law that we review de novo. *Cf. Grohman v. Kahlig*, 318 S.W.3d 882, 887 (Tex. 2010) ("Whether a party has breached a contract is a question of law for the court, not a question of fact for the jury, when the facts of the parties' conduct are undisputed or conclusively established."); *State ex rel.*

44

*Dep't of Criminal Justice v. VitaPro Foods, Inc*., 8 S.W.3d 316, 323 (Tex. 1999) (concluding that when the underlying facts are undisputed, the determination of whether something constitutes an "agricultural commodity" under the Direct Purchasing Statute is a question of law); *Friends of Canyon Lake, Inc. v. Guadalupe-Blanco River Auth*., 96 S.W.3d 519, 529 (Tex. App.—Austin 2002, pet. denied) (concluding that because the facts were undisputed as to the content of the notice under the Open Meetings Act, the determination of the adequacy of the notice was a question of law).

Presentment of a claim under section 38.002 is required to allow the person against whom the claim is asserted an opportunity to pay the claim within thirty days of receiving notice of the claim, thereby avoiding the obligation to pay attorney's fees. *Brainard v. Trinity Universal Ins. Co*., 216 S.W.3d 809, 818 (Tex. 2006). "The claimant bears the burden to plead and prove presentment of the claim." *Gibson v. Cuellar*, 440 S.W.3d 150, 157 (Tex. App.—Houston [14th Dist.] 2013, no pet.). The term "presentment" means "simply a demand or request for payment or performance[.]" *Id*. All that is necessary is that the party seeking attorney's fees show that it made an assertion of a debt or claim and a request for compliance to the opposing party, and that the opposing party refused to pay the claim. *Busch v. Hudson & Keyse, LLC*, 312 S.W.3d 294, 300 (Tex. App.—Houston

45

[14th Dist.] 2010, no pet.). "No particular form of presentment is required." *Jones v. Kelley*, 614 S.W.2d 95, 100 (Tex. 1981). However, neither the filing of suit, nor the allegation of a demand in the pleadings can, alone, constitute presentment of a claim or a demand that a claim be paid. *Helping Hands Home Care, Inc. v. Home Health of Tarrant Cnty., Inc.*, 393 S.W.3d 492, 516 (Tex. App.—Dallas 2013, pet. denied); *Jim Howe Homes, Inc. v. Rogers*, 818 S.W.2d 901, 904 (Tex. App.—Austin 1991, no writ).

Associates served its answers and objections to TNIG's first set of interrogatories on July 3, 2008. Interrogatory number twelve and Associates' answer to that interrogatory state as follows:

**INTERROGATORY NO. 12:**

Please specify any and all notes/contracts listed in Exhibit A that have been paid in full to Associates yet Associates has failed to pay the residual balance due to TNIG. Please state the name of the borrower(s), the date(s) of the payoff(s), the residual balance(s) due to TNIG and the reason or reasons why Associates has withheld payment.

**ANSWER:**

Subject to the general objections set forth above, [Associates] answers Interrogatory No. 12 on information and belief as follows:

To the extent that any amount over and above the amounts [Associates] was entitled to receive and retain either as a result of a refinance, foreclosure or otherwise, was received by [Associates], the excess was tendered to [TNIG] unless [TNIG] was unwilling or unable to establish that [TNIG] owned the residual interest and

46

[Associates] could not verify ownership with the original payee/seller. In those cases, the excess is being held by [Associates] in trust. Accounts for which any excess is being held are as follows:

8009812196; 8009811128; 8009815912; 8009804488; 8009819540; 8009815128; 8009812295; 8008810282; 8008314035; 8009811273; 80082837172; 8009819360; 8009811907; 8009815518; 8009812309; 8009812208.

The total for the foregoing is: $93,867.27.

TNIG argues that interrogatory number twelve and Associates' answer to that interrogatory, together, constitute presentment of its claim for breach of the individual DOTPAs for purposes of section 38.002. In support of this argument, TNIG argues that at least two Texas courts have found that the presentment requirement can be accomplished through a request for admission and the opposing party's response thereto. TNIG argues that interrogatory number twelve and Associates' answer to that interrogatory are analogous to the requests for admissions and responses in those cases and, therefore, serve as a sufficient basis to find that TNIG presented its claim for breach of the individual DOTPAs to Associates no later than July 3, 2008.

In certain cases, Texas courts have found a request for admission and the opposing party's response thereto sufficient to satisfy the presentment requirement under section 38.002. *See, e.g., Busch*, 312 S.W.3d at 301; *Lone Star Steel Co. v. Scott*, 759 S.W.2d 144, 157 (Tex. App.—Texarkana 1988, writ denied); *Gensco,*

47

*Inc. v. Transformaciones Metalurgicias Especiales, S.A.*, 666 S.W.2d 549, 554 (Tex. App.—Houston [14th Dist.] 1984, writ dism'd); *Welch v. Gammage*, 545 S.W.2d 223, 226 (Tex. Civ. App.—Austin 1976, writ ref'd n.r.e.). In those cases, however, the request for admission and response, either alone or coupled with other evidence, generally established that the party seeking attorney's fees had made a demand for payment on the opposing party or that a claim or debt had been asserted and the opposing party refused to pay the claim. *See Busch*, 312 S.W.3d at 301; *Lone Star Steel*, 759 S.W.2d at 157; *Gensco*, 666 S.W.2d at 552, 554; *Welch*, 545 S.W.2d at 226.

In *Busch*, for example, the court of appeals found that requests for admissions and the defendant's responses thereto, in which the defendant admitted (1) that the plaintiff "'made demand on [the defendant] before filing suit[] for payment of the outstanding balance due at that time'" and (2) that the defendant had "'received a demand letter from [the plaintiff,] for payment on the account'" were sufficient to satisfy the presentment requirement under section 38.002. 312 S.W.3d at 301. Similarly, in *Lone Star Steel*, the court of appeals concluded that the defendant's response to a request for admission, in which the defendant admitted that the plaintiff had repeatedly requested payment for a suggestion he had made that improved the efficiency of certain operations performed by the

defendant, was sufficient proof of presentment for purposes of section 38.002. 759 S.W.2d at 146, 157. In each of those cases, the request for admission and response established that the party seeking attorney's fees had made a specific demand or request for payment on the opposing party. *See Busch*, 312 S.W.3d at 301; *Lone Star Steel*, 759 S.W.2d at 157.

In *Gensco*, the court of appeals concluded that copies of invoices sent by the plaintiff to the defendant, coupled with the defendant's responses to requests for admission in which the defendant admitted that it had accepted the goods, that the amounts reflected in the invoices were the agreed prices, and that it had not paid the full purchase price under any of the invoices, were sufficient to establish that the plaintiff had presented its claim to the defendant under the predecessor statute to section 38.002. 666 S.W.2d at 552, 554. In that case, the invoices themselves constituted evidence of a request for payment by the plaintiff, and the defendant's admissions established that the invoices contained the agreed upon prices and remained unpaid. *See id*.

In *Welch*, the plaintiff real estate broker sued the defendant for breach of contract to recover an $8,905 real estate commission and sought recovery of his attorney's fees. 545 S.W.2d at 224. The court of appeals found that a request for admission propounded by the plaintiff, coupled with the defendant's response in

49

which the defendant admitted that he "'refused to pay and still refuses to pay the said sum ($8,905) to [the plaintiff,]'" were sufficient to operate as presentment of the claim for purposes of the statute. *Id.* at 226 (construing predecessor statute to Chapter 38 of the Texas Civil Practice and Remedies Code). In that case, the request for admission and its response satisfied the presentment requirement because they established that the defendant had refused and was still continuing to refuse to pay a claim that had been asserted by the plaintiff. *See id.*

In the present case, interrogatory number twelve inquires about the existence of a specific category of notes and contracts—namely, notes and contracts that have been paid in full to Associates and which have a residual balance that is owed, but has not been paid, to TNIG. The interrogatory does not mention the individual DOTPAs or assert that Associates has failed to comply with any terms of the individual DOTPAs. It does not demand or request payment of any excess funds, and it does not ask Associates to admit that a demand or request for payment by TNIG has ever been made. The interrogatory does not assert that a debt for the excess funds is actually owed by Associates; rather, at most, it inquires whether a debt exists at all. In its answer, Associates does not admit the existence of any debt for excess funds owed to TNIG, nor does it admit that TNIG has ever affirmatively asserted a debt or a claim for excess funds. Associates' answer also

50

does not admit that TNIG ever made a demand or request to Associates for payment of excess funds or that Associates had ever refused or was continuing to refuse to pay excess funds to TNIG after being requested to do so. Accordingly, we find that the trial court did not err when it concluded that interrogatory number twelve and Associates' answer thereto did not constitute presentment by TNIG of its claims for breach of the individual DOTPAs.

## C. Whether the Tender Was Unconditional

TNIG next argues that the July 21, 2011 tender was ineffective because it was not an unconditional tender of funds. In order for a tender to defeat a claim for attorney's fees or a claim for interest on the obligation accruing after the date of the tender, the tender must be unconditional. *See Staff Indus.*, 846 S.W.2d at 548-49, 549-50; *see also Baucum v. Great Am. Ins. Co. of N. Y.*, 370 S.W.2d 863, 866 (Tex. 1963). "An attempted tender is without legal effect if it is accompanied by conditions which the debtor has no right to impose." *Staff Indus.*, 846 S.W.2d at 549; *see also Thomas*, 917 S.W.2d at 438.

In *Staff Industries*, the creditor claimed that the debtor owed it $99,524.45, but the debtor tendered a check to the creditor for only $53,119.71. 846 S.W.2d at 548. On the back of the check, the debtor wrote: "'Endorsement constitutes payment in full of PO *270-003* except for $2,500.00 retainage for vents.'" *Id*. The

51

creditor refused the tender, and after a bench trial, the trial court found that the creditor was entitled to recover $53,119.71, plus pre-judgment interest. *Id*. at 545. The Corpus Christi Court of Appeals held that the check was not a valid tender by the debtor because it did not constitute an unconditional tender of funds. *Id*. at 549. Specifically, the court noted that the offer "was conditional upon [the creditor] relinquishing any claim for the higher amount and therefore was an offer to settle the dispute for the lesser amount." *Id*. The court explained that "[a]n offer to settle . . . is not equivalent to an unconditional tender of the amount offered in settlement[]" and that "[u]nlike an unconditional tender, an offer to settle for the lower amount would deprive the [the creditor] of his right even to seek the higher amount." *Id*. The court concluded that because the offer required the creditor to give up its right to seek the higher amount, the offer did not constitute an effective tender for purposes of section 38.002. *Id*.

Other Texas courts have similarly concluded that a purported tender by a debtor that requires the creditor to release its claims against the debtor, to give up a legal right, or to otherwise perform an act that the debtor has no right to demand is conditional and does not constitute a valid tender. *See*, *e.g., Crisp Analytical Lab, L.L.C. v. Jakalam Props., Ltd*., 422 S.W.3d 85, 92 (Tex. App.—Dallas 2014, pet. denied) (concluding that debtor's offer to pay debt, which was in the form of a

52

release of claims, was a conditional offer and did not constitute a valid tender); *Thomas*, 917 S.W.2d at 438 (concluding that debtor's offer to pay debt, which required the creditor to relinquish her right to collect attorney's fees in a turnover proceeding, was an invalid, conditional tender); *Stratton v. Del Valle Indep. Sch. Dist.*, 547 S.W.2d 727, 729 (Tex. Civ. App.—Austin 1977, no writ) (concluding that debtor's purported offer to pay creditor delinquent property taxes "'if [the creditor] would straighten [the description of the property tracts] out'" was a conditional offer to pay the debt and, therefore, did not constitute a valid tender). Texas courts have also found that a debtor who deposits funds into the registry of the court, but who simultaneously files a claim for affirmative relief to recover all or a portion of the deposited funds, does not make an unconditional tender. *See Weisfeld v. Tex. Land Fin. Co.*, 162 S.W.3d 379, 383 (Tex. App.—Dallas 2005, no pet.) (concluding that debtor did not make an unconditional tender when it deposited funds into the registry of the court, but at the same time filed a counterclaim against the creditor for usurious interest and sought to recover a portion of the deposited funds).

The trial court concluded that Associates' July 21, 2011 tender was a valid tender and, thus, implicitly found that the tender was unconditional. *See Whiteside v. Griffis & Griffis, P.C.*, 902 S.W.2d 739, 747 n. 11 (Tex. App.—Austin 1995,

53

writ denied). Although the issue of whether a tender is conditional is typically a question of fact, TNIG again challenges only the trial court's application of the law to undisputed facts. The July 21, 2011 tender letter, which was admitted into evidence at trial, states as follows:

> Enclosed please find a check payable to [TNIG] in the amount of $174,562.50 which amount is comprised of (i) $141,558.89 representing the aggregate amount held by [Grand] for paid off and paid out accounts plus (ii) interest from the dates the payments which make up the [$141,558.89] were received by [Grand] through July 22, 2011 totaling $33,003.61. . . . Additionally, for the paid out contracts for deed and mortgages listed on the enclosed spreadsheet, [Associates] is prepared [to] reassign the contracts for deed and mortgage[s] to TNIG or TNIG's designee and to deliver any payments received by or on behalf of [Associates] with respect to such contracts for deed and mortgages from and after the date hereof. In that regard, for each of the paid out contracts for deed and mortgages listed on the enclosed spreadsheet, please identify the person(s) to whom [Associates] is to reassign the contract for deed or mortgage and please provide the address for delivery of the documents and any payments received from and after July 22, 2011.

> *By making this tender, [Associates] is not waiving its argument that [Grand] on behalf of [Associates] was justified in withholding excess proceeds for paid off contracts and mortgages and in delaying paying amounts collected for paid out accounts and reassigning the contracts for deed and mortgages based on TNIG's breach of its representations and warranties set forth in the [DOTPAs],* nor is [Associates] waiving any of its indemnity rights against TNIG under those agreements with respect to any claim asserted or which may be asserted in the future by any third-party including, but not limited to TNIG's sellers. Furthermore, please note that this tender is being made within thirty (30) days of the filing of Plaintiff's Third Amended Petition wherein TNIG for the first time asserted a claim for an alleged failure by [Associates] to pay amounts due to TNIG under

54

the [DOTPAs] as contrasted with TNIG's claim for breach of an alleged global agreement arising out of [Associates'] failure to pay second funding. Therefore, pursuant to Texas Civil Practice & Remedies Code §38.002(3), TNIG is not entitled to recover any attorney's fees in connection with the newly added claim.

Lastly, to the extent TNIG contends that the amount of the tender for any of the listed contracts for deed or mortgages is in any way insufficient, please let me know and provide the basis for such contention as [Associates] fully intends to pay the correct amount, if any, due.

(Emphasis added).

TNIG claims that Associates' reservation of its justification defense in the tender letter constitutes an improper condition that rendered the tender ineffective.[8] Associates, by contrast, argues that the statement regarding its justification defense in the July 21, 2011 letter does not constitute a condition on the tender. Instead, Associates argues, the July 21, 2011 tender letter and check unconditionally tendered the full amount due to TNIG under the DOTPAs and, by reserving its justification defense, Associates merely reserved its right to defend itself against

---

[8] TNIG does not argue that Associates' reservation of its contractual indemnity rights under the DOTPAs constituted an improper condition on the tender. Therefore, we need not address whether this additional reservation constituted an improper condition on appeal. *See Fulgham v. Fischer*, 349 S.W.3d 153, 158 (Tex. App.—Dallas 2011, no pet.) (concluding that the failure to raise an issue or cite supporting legal authority results in waiver of a complaint on appeal); *Canton-Carter v. Baylor Coll. of Med.*, 271 S.W.3d 928, 930 (Tex. App.—Houston [14th Dist.] 2008, no pet.) ("In the review of a civil case, an appellate court has no discretion to consider an issue not raised in an appellant's brief.").

claims, including TNIG's request for punitive damages, seeking additional damages over and above the amount of the tender. We agree that the statement in the July 21, 2011 letter reserving Associates' justification defense was not a condition on the tender.

The July 21, 2011 letter expressly states that Associates sought to tender to TNIG an amount representing all payments that were being held by Grand in the Escrow Account for "paid off and paid out accounts[,]" plus interest on those payments from the date they were received by Grand through July 22, 2011. The letter also offers to reassign to TNIG all of the paid-out notes and contracts for deed for the accounts listed in the letter and to deliver to TNIG any future payments received by Grand for those accounts. In the last paragraph, the letter states that Associates fully intended to pay the correct amount due to TNIG and requested that TNIG notify Associates to the extent it found any of the tendered amounts to be insufficient. These statements unambiguously express an intention by Associates to pay TNIG all amounts that TNIG was seeking to recover as direct damages in connection with its claims for breach of the individual DOTPAs. They also express an unambiguous intention to reassign all active paid-out notes and contracts for deed to TNIG so that any future payments made by the borrowers on those notes and contracts for deed would be paid to TNIG directly.

56

The only statement in the July 21, 2011 letter that TNIG claims constituted a condition on the tender is Associates' reservation of its justification defense. A condition is "[a] future and uncertain event on which the existence or extent of an obligation or liability depends[,]" or "an uncertain act or event that triggers or negates a duty to render a promised performance." *Condition,* BLACK'S LAW DICTIONARY (9th ed. 2009). Nothing in the letter's reservation language, or in any other portion of the July 21, 2011 letter, indicates that TNIG's ability to accept or retain the tendered funds was dependent upon some future and uncertain event or that TNIG was required to undertake any action in order to obtain the tendered funds. *Cf. id.*; *Stratton*, 547 S.W.2d at 729. Further, nothing in the letter requires TNIG to release or dismiss any claims against Associates, nor does the letter demand that TNIG waive or relinquish any rights that it may possess, including the right to seek a larger amount in connection with its claims for breach of the individual DOTPAs. *Cf. Crisp Analytical Lab*, 422 S.W.3d at 92; *Thomas*, 917 S.W.2d at 438; *Staff Indus*., 846 S.W.2d at 549.

Instead, the July 21, 2011 letter merely reserves Associates' right to argue that "[Grand] on behalf of [Associates] was justified in withholding excess proceeds for paid off contracts and mortgages and in delaying paying amounts collected for paid out accounts and reassigning the contracts for deed and

57

mortgages based on TNIG's breach of its representations and warranties set forth in the [DOTPAs.]" Associates' justification defense is not based on the premise that Associates is entitled to any portion of the tendered funds, and it does not seek to recoup or recover back any portion of the tendered funds from TNIG. Rather, Associates' justification defense simply seeks to establish that Grand, on behalf of Associates, was entitled to withhold and delay payment of the funds in the Escrow Account, and to delay reassignment of the paid-out accounts, while Grand investigated whether other parties had potential claims to those funds. We do not interpret Associates' reservation of its justification defense as reserving any right to challenge TNIG's contractual entitlement to the tendered funds under the terms of the DOTPAs. Instead, we interpret it as merely reserving Associates' right to defend itself against the imposition of additional damages beyond the amount of the tender, including punitive damages based on TNIG's claim for malicious conversion, which TNIG might claim resulted from Grand's act of withholding payment of the excess proceeds, rather than paying those funds immediately to TNIG.[9] We conclude, therefore, that Associates unconditionally tendered the

_____

[9] Associates' reservation of its justification defense essentially restates Associates' "qualified good faith refusal" defense to TNIG's claims for conversion, including TNIG's claim for malicious conversion on which TNIG's request for punitive damages is based. *See Whitaker v. Bank of El Paso*, 850 S.W.2d 757, 760 (Tex. App.—El Paso 1993, no writ) (concluding that a qualified

$174,562.50 as payment for the portion of TNIG's claims that it did not dispute. The fact that Associates reserved the right to defend itself against the remaining portion of TNIG's claims seeking damages over and above the amount of the tender did not make Associates' tender of $174,562.50 conditional.

TNIG relies on *Commercial Union Ins. Co. v. La Villa Independent School District*, in support of its argument that the tender was conditional. 779 S.W.2d 102 (Tex. App.—Corpus Christi 1989, no writ). In *Commercial Union*, the plaintiff, a school district, entered into a construction contract with the defendant, a contractor, for the construction of a gymnasium. *Id*. at 104. After the construction was completed, the school district notified the contractor of certain deficiencies in the construction. *Id*. The contractor failed to remedy the problem, and the school district hired a different contractor to correct the deficiencies for $12,950. *Id*. The school district also separately withheld $9,100 from the contractor's payment pursuant to a liquidated damages provision in the contract because the contractor did not complete the construction by the date set forth in the contract. *Id*. at 106. Before suit was filed, the contractor, in an attempt to resolve the dispute, made an offer to pay the school district what it claimed to be the full amount due, including

refusal to "deliver property on request may be justified in order to investigate the rights of the parties" and is a defense to a claim for conversion if it "is made in good faith to resolve a doubtful matter").

attorney's fees. *Id*. at 107. The school district, however, rejected the offer when the contractor refused to surrender its right to claim that the liquidated damages provision was invalid and its right to recover the $9,100 withheld by the school district under that provision. *Id*. Thereafter, the school district filed suit against the contractor, and the contractor filed a counterclaim seeking the $9,100 withheld by the school district. *Id*. at 104, 107. After a trial, the court entered a judgment in favor of the school district for $12,950, plus attorney's fees, and denied the contractor's counterclaim. *Id*. at 104. On appeal, the contractor argued that it had tendered the full amount due prior to the filing of suit and that the school district was therefore barred from recovering attorney's fees. *Id*. at 107. The court of appeals, however, held that the tender was ineffective because it did not constitute an unconditional offer to pay. *Id*. The court explained that the contractor "placed a condition upon its settlement offer; i.e. that [the contractor] would retain the right to claim that the liquidated damage provision was invalid." *Id*. The court also explained that the contractor's offer constituted an offer of settlement, which is not the equivalent of a tender, and even if it had been a tender, it would have been less than the amount necessary to avoid awarding attorney's fees because the amount did not include a relinquishment of the contractor's affirmative claim to recover the liquidated damages. *Id*.

60

TNIG argues that *Commercial Union* stands for the general proposition that when a defendant makes a tender of the full amount due, but states that it is retaining its right to maintain a defense, the tender is conditional and does not operate to cut off the plaintiff's right to attorney's fees under section 38.002. We do not read *Commercial Union* so broadly. In *Commercial Union*, the rights that the contractor refused to surrender when it made the attempted tender were its right to claim that the liquidated damages provision constituted an unenforceable penalty and its right to affirmatively recover sums withheld under that provision by seeking an offset against the amount demanded by the school district. *See id.* at 107. By reserving its right to seek an offset, the contractor essentially reserved its right to claim that it was entitled to recover back a portion of the total amount due to the school district. *See id.* By contrast, in its July 21, 2011 letter, Associates does not assert that it is entitled to any portion of the tendered funds or any offset against the tendered funds. Further, as noted above, the tender letter does not reserve the right to assert any claim or defense that seeks to recover back any portion of the tendered funds, but only to defend against claims for further damages. We conclude, therefore, that *Commercial Union* is distinguishable from the present case.

TNIG also relies on statements contained in a September 22, 2011 letter from Associates to TNIG to establish that the July 21, 2011 tender was conditional.[10] In the September 22, 2011 letter, which itself did not attempt to tender any funds, Associates stated in relevant part as follows:

> I received your letter of September 21, 2011, once again returning the tendered funds after a significant delay. The check was first sent to you on July 21, 2011 and received by you on July 22, 2011. You returned the check for the first time on September 7, 2011. The check was returned to you by FedEx on the same day, received by you on September 8, 2011, and held by you until it was sent to me again on September 21, 2011.
>
> Since the funds have been returned by TNIG twice, I do not think there is any question that any further efforts to tender the funds would be rejected. If you contend otherwise, please let me know.
>
> . . . .
>
> As set forth in previous letters, by making the tender, Associates is not waiving any argument that the alleged delay by Associates and [Grand] in paying the alleged excess was justified, and *Associates reserves its right to argue that the delay was justified and the payment [was] excused by TNIG's misrepresentations and breaches of warranties, including those arising out of TNIG's failure to pay its sellers the full purchase price.*

(Emphasis added). TNIG argues that the statement in the September 22, 2011 letter that "Associates reserves its right to argue that . . . the payment [was] excused . . ." makes the tender conditional because Associates reserved its right to argue that

---

[10] The September 22, 2011 letter was admitted into evidence at trial as Exhibit 496. Exhibit 496 is not included in the reporter's record. However, the September 22, 2011 letter is included in the clerk's record.

TNIG was not entitled to retain all or a portion of the tendered funds. However, we need not analyze whether this statement constitutes a condition because there is no evidence in the record that such a statement was included in or otherwise made a part of the July 21, 2011 tender. Instead, the record reflects only that the statement was made by Associates in subsequent correspondence, which did not purport to tender any money to TNIG and did not, itself, constitute a tender of funds. *See Collingsworth v. King*, 283 S.W.2d 30, 33 (Tex. 1955) (concluding that no evidence existed to support the trial court's finding that the tender of funds due under certain notes was conditional; although the debtor sent the creditor pre-tender letters requesting that the creditor execute a release and an assignment of the notes in connection with the tender, there was no evidence that the debtor required a release or an assignment at the time the tender was actually made); *see also Baucum*, 370 S.W.2d at 866 ("A valid tender of money consists of the actual production of the funds and offer to pay the debt involved."). Because we conclude that the statement in the July 21, 2011 tender reserving Associates' right to assert its justification defense does not constitute a condition on TNIG's acceptance of the tendered funds, we conclude that the statement did not operate to invalidate the tender.

## D.     Amount of the Tender

TNIG next argues that the tender was invalid because it was not for the correct amount owed to TNIG under the individual DOTPAs. As a general rule, a tender of payment must include everything to which the creditor is entitled, and a tender of any less sum is ineffective. *Crisp Analytical Lab*, 422 S.W.3d at 92. Accordingly, a partial tender will not prevent an award of attorney's fees or the accrual of interest. *Id.*; *J.M. Hollis Constr. Co. v. Paul Durham Co.*, 641 S.W.2d 354, 358 (Tex. App.—Corpus Christi 1982, no writ).

The trial court made the following relevant findings of fact: (1) TNIG presented evidence in connection with twenty-five accounts at trial; (2) TNIG was entitled to recover damages for eighteen of those accounts; (3) TNIG was entitled to an aggregate recovery of $131,876.85, inclusive of interest; (4) on July 21, 2011, Associates tendered the aggregate sum of $174,562.50, inclusive of interest, to TNIG; (5) the tender included payments of principal and interest for each of the eighteen accounts for which TNIG was ultimately awarded damages at trial; and (6) the amount of damages that TNIG was entitled to recover for each of the eighteen accounts was equal to or less than the amounts included in the tender for those accounts. TNIG has not challenged any of these findings on appeal.

The trial court's findings establish that the amount of the July 21, 2011 tender exceeded the aggregate amount of damages awarded to TNIG at trial by over $40,000. Further, the trial court's findings establish that the tender included payments for each of the accounts for which TNIG recovered at trial and that those payments were equal to or greater than the amount of damages ultimately found to be owed by Associates to TNIG for those accounts. These unchallenged findings support the trial court's conclusion that Associates' July 21, 2011 tender was for "an amount in excess of the just amount owed by Associates to TNIG." Because TNIG has not challenged the relevant fact findings pertaining to this issue on appeal and because those findings support the trial court's conclusion that the July 21, 2011 tender exceeded the just amount owed to TNIG, we conclude that the tender was for an amount sufficient to preclude TNIG's recovery of attorney's fees and to stop the accrual of interest on the obligations underlying the claims that form the basis of the trial court's judgment. *See Robberson Steel, Inc. v. J.D. Abrams, Inc.*, 582 S.W.2d 558, 565 (Tex. Civ. App.—El Paso 1979, no writ) (concluding that amount of tender was sufficient where the tender was for an amount that was greater than the actual amount found to be due to the creditor). We overrule TNIG's second issue.

## VI.    Motion for Summary Judgment

In its third point of error, TNIG argues that it was procedurally improper for the trial court to reconsider and grant Associates' May 13, 2011 motion for summary judgment at the docket call on January 20, 2012, because TNIG received no notice that the trial court intended to reconsider such motion. Specifically, TNIG argues that under Texas Rule of Civil Procedure 166a(c), it was entitled to receive twenty-one days' notice of any hearing on Associates' May 13, 2011 motion for summary judgment, including a hearing to reconsider such motion. TNIG argues that because it did not receive any such notice, the January 20, 2012 order partially granting Associates' May 13, 2011 motion for summary judgment should be reversed. We disagree.

An order denying a motion for summary judgment is an interlocutory order. *See Humphreys v. Caldwell*, 888 S.W.2d 469, 470 (Tex. 1994). A trial court has the inherent authority to change or modify an interlocutory order or judgment at any time before the judgment becomes final. *Rush v. Barrios*, 56 S.W.3d 88, 98 (Tex. App.—Houston [14th Dist.] 2001, pet. denied). "A trial court may, in the exercise of discretion, properly grant summary judgment after having previously denied summary judgment without a motion by or prior notice to the parties, as long as the court retains jurisdiction over the case." *H.S.M. Acquisitions, Inc. v.*

*West*, 917 S.W.2d 872, 876-77 (Tex. App.—Corpus Christi 1996, writ denied); *see also KSWO Television Co., Inc. v. KFDA Operating Co., LLC*, 442 S.W.3d 695, 699 (Tex. App.—Dallas 2014, no pet.).

In *Winn v. Martin Homebuilders, Inc.*, the Amarillo Court of Appeals concluded that the 21-day notice provision in Rule 166a(c) does not apply to the trial court's reconsideration of its prior ruling denying a motion for summary judgment. 153 S.W.3d 553, 556 (Tex. App.—Amarillo 2004, pet. denied). In *Winn*, the defendant filed a motion for summary judgment on the plaintiffs' claims, which the trial court subsequently denied. *Id.* at 555. The defendant filed a motion for rehearing on its summary judgment motion, and the trial court held a hearing on the motion for rehearing thirteen days after the defendant's motion for rehearing was filed. *Id.* Following the hearing, the trial court entered an order granting the defendant's motion for summary judgment. *Id.* at 555. The plaintiffs appealed, arguing that the trial court erred in reconsidering and granting the defendant's motion for summary judgment because the plaintiffs did not receive proper notice of the hearing on the defendant's motion for rehearing. *Id.* at 555-56. Specifically, the plaintiffs argued that under Rule 166a(c), they were entitled to receive at least twenty-one days' notice of any hearing on the defendant's motion for summary judgment, including any hearing to rehear or reconsider the summary judgment

67

motion. *Id*. The court of appeals, however, rejected the plaintiffs' argument, concluding that the notice requirement under Rule 166a(c) applies only to the initial hearing on a motion for summary judgment. *Id*. at 555. The court of appeals explained that the "[d]enial of a motion for summary judgment is not a final adjudication, but an interlocutory ruling that may be changed or modified until a final judgment is rendered." *Id*. at 556. In addition, the court explained that "[a] motion for summary judgment previously denied maybe granted without a further motion or prior notice to the parties." *Id*. at 556. The court, therefore, concluded that the failure to provide the plaintiffs with 21 days' notice before the hearing at which the trial court reconsidered the defendant's motion for summary judgment was not error. *Id*. at 556.

We agree with the reasoning set forth in *Winn* and conclude that the twenty-one day notice requirement set forth in Rule 166a(c) does not apply to a trial court's reconsideration of its prior ruling on a motion for summary judgment. *See id*. We also agree that a trial court may reconsider and grant a motion for summary judgment that it has previously denied without prior notice to the parties as long as the trial court retains jurisdiction over the case. *See KSWO Television*, 442 S.W.3d at 699; *Rush*, 56 S.W.3d at 98; *H.S.M. Acquisitions*, 917 S.W.2d at 876-77. In the present case, the record reflects that the trial court rendered judgment on August

24, 2012, and that the judgment became final on December 7, 2012, thirty days after TNIG's motion for new trial was overruled by operation of law. *See* Tex. R. Civ. P. 329b(c), (e). Therefore, the trial court had authority at the docket call on January 20, 2012 to reconsider its prior interlocutory order denying Associates' May 13, 2011 motion for summary judgment and to modify or change that order without prior notice to the parties. *See Winn*, 153 S.W.3d at 556; *Rush*, 56 S.W.3d at 98; *H.S.M Acquisitions*, 917 S.W.2d at 877. Therefore, we conclude that the trial court did not err when it reconsidered and granted the May 13, 2011 motion for summary judgment without giving prior notice to the parties.

Further, as the court in *Winn* explained, "[t]he notice provisions of Rule 166a are intended to prevent rendition of summary judgment without the non-movant having full opportunity to respond on the merits of the motion." *Winn*, 153 S.W.3d at 556. Here, Associates' motion for summary judgment was filed on May 13, 2011. On June 2, 2011, TNIG filed a thirty-seven page response, to which it attached over 850 pages of exhibits. After Associates filed a reply brief in support of its motion for summary judgment on June 9, 2011, TNIG sought leave to and filed additional briefing that addressed the arguments raised by Associates in its May 13, 2011 motion for summary judgment. TNIG does not contend that it did not receive the required twenty-one days' notice of the initial hearing on the

69

motion for summary judgment, which was held on June 24, 2011. Accordingly, we conclude that TNIG was afforded a full opportunity to respond to the merits of Associates' May 13, 2011 motion for summary judgment.

TNIG also argues that the trial court lacked authority to reconsider and grant the May 13, 2011 motion for summary judgment on its own initiative. TNIG relies on *Daniels v. Daniels*, 45 S.W.3d 278, 282 (Tex. App.—Corpus Christi 2001, no pet.), for authority that the trial court erred. In *Daniels*, the trial court entered summary judgment in a case in which no motion for summary judgment was filed by either party. *Id.* at 282. On appeal, the court concluded that the trial court had no jurisdiction and, thus no authority, "to enter a summary judgment . . . absent a proper motion for summary judgment[.]" *Id.* at 281, 282. While we agree with the general proposition in *Daniels* that a trial court may not grant a summary judgment where no motion for summary judgment has ever been filed, that is clearly not the case here. It is undisputed that Associates filed a motion for summary judgment on May 13, 2011 and that the trial court's January 20, 2012 order granted certain parts of that motion. Therefore, we conclude that *Daniels* is distinguishable from the present case.

Here, TNIG's real complaint appears to be that the trial court, sua sponte, reconsidered the May 13, 2011 motion for summary judgment in the absence of

any further request by either party to reconsider or rehear the motion for summary judgment. A trial court has the authority to reconsider its original ruling on a motion for summary judgment either on a proper motion or on its own initiative. *Ravkind v. Mortgage Funding Corp.*, 881 S.W.2d 203, 205 (Tex. App.—Houston [1st Dist.] 1994, no writ). No motion or request for reconsideration by a party is required. *See KSWO Television*, 442 S.W.3d at 699; *Rush*, 56 S.W.3d at 98; *H.S.M. Acquisitions*, 917 S.W.2d at 877. We conclude, therefore, that the trial court had authority to reconsider and grant Associates' May 13, 2011 motion for summary judgment on its own initiative. We overrule TNIG's third issue.

Having overruled each of TNIG's issues on appeal, we affirm the judgment of the trial court.

AFFIRMED.

_____
CHARLES KREGER
Justice

Submitted on May 1, 2014
Opinion Delivered September 24, 2015

Before McKeithen, C.J., Kreger and Johnson, JJ.

71