

NUMBER 13-16-00090-CV

COURT OF APPEALS

THIRTEENTH DISTRICT OF TEXAS

CORPUS CHRISTI - EDINBURG

STATE FARM LLOYDS,                                                              Appellant,

v.

RUBEN AND MAYRA VEGA,                                                          Appellees.

**On appeal from the 430th District Court
of Hidalgo County, Texas.**

# MEMORANDUM OPINION ON REHEARING

**Before Chief Justice Valdez and Justices Contreras and Hinojosa
Memorandum Opinion by Chief Justice Valdez**

Appellant State Farm Lloyds ("State Farm") appeals from a judgment in favor of appellees, Ruben and Mayra Vega. By six issues, State Farm argues that: (1) there is no evidence to support the breach of contract claim; (2) no evidence supports an award of extra-contractual damages; (3) there is legally insufficient evidence of attorney's fees; (4) State Farm is entitled to a take-nothing judgment based on its settlement offer under

Texas Civil Practice and Remedies Code, Chapter 42 and Texas Rule of Civil Procedure 167; (5) it is entitled to a new trial because "[t]he trial court improperly disqualified all State Farm insureds from the jury, resulting in a materially unfair trial"; and (6) the evidence is factually insufficient to support the judgment. We affirm.[1]

## I. LEGAL SUFFICIENCY

By its first, second, and third issues, State Farm contends that there is no evidence to support the Vegas' claim of breach of contract, an award of extra-contractual damages, and an award of attorney's fees. Specifically, in its first issue, State Farm argues that the Vegas' breach of contract claim fails "as a matter of law because there is no evidence of any damage to the Vegas' house that resulted from a storm during the policy period other than what was included in State Farm's repair estimate, which was far less than the Vegas' deductible." In its second issue, State Farm argues that "because the Vegas failed to prove that State Farm owed additional coverage and had breached the insurance policy, their common law bad faith claim and Insurance Code claims also fail as a matter of law." Additionally, State Farm argues in its second issue that the Vegas' "extra-contractual claims fail because there is no evidence that State Farm's conduct proximately caused the damages awarded or that the damages reflect an injury independent from the contract claim." Finally, by its third issue, State Farm argues that the evidence is insufficient to support the award of attorney's fees because the Vegas did

---

[1] State Farm filed a motion for rehearing on November 6, 2017. *See* TEX. R. APP. P. 49.1. We requested and received a response from the Vegas, and State Farm has filed a reply to the Vegas' response. After due consideration, we withdraw our previous memorandum opinion and judgment and substitute the following memorandum opinion and accompanying judgment. State Farm's motion for rehearing is denied.

not present any evidence "about the specific work performed and no opinion that this was a reasonable and necessary fee for this case."

## A.    Standard of Review

The test for legal sufficiency is "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005).  We review the evidence in the light most favorable to the verdict, crediting any favorable evidence if a reasonable fact-finder could and disregarding any contrary evidence unless a reasonable fact-finder could not.  *Id.* at 821–22, 827.

A no-evidence point will be sustained when (1) there is a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of a vital fact.  *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003); *see City of Keller*, 168 S.W.3d at 810.  Less than a scintilla of evidence exists when the evidence is "so weak as to do no more than create a mere surmise or suspicion" of a fact, and the legal effect is that there is no evidence.  *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983).

## B.    Pertinent Evidence

Evidence was presented that the Vegas' policy covered the period from March 8, 2013 through March 8, 2014 and that it provided coverage for wind damage to the roof and for water damage to the interior caused by any leaks in the roof.  State Farm promised

to pay for the repairs or replacement of damaged parts of the property subject to the Vegas' $2,048 deductible.

Raul Resendez, the owner of the State Farm agency where the Vegas purchased their home insurance policy, testified that as the underwriters of the Vegas' policy, State Farm required that he, among other things, physically inspect the property prior to issuance of the policy. Resendez stated that he looks at "Fascia, roof, sidewalks" and anything that could be a danger to somebody. Resendez confirmed that he inspected the Vegas' house during the application process and that when he conducts an inspection of a home, although he does not get on the roof, he inspects it from all sides for possible hail damage, and curled, loose, or missing shingles. Resendez said, "If [the roof is] visible" he inspects it and "I'm looking at what is visible from—from that street level view. . . ." Resendez identified a document admitted as Plaintiff's Exhibit 3 as including pictures he took of the Vegas' house and communication to his office regarding "whether [he] saw missing shingles, a fence, something that would be a risk would have been [his] feedback back to the office." Resendez testified that the document states, "indicate any of the following that may be a concern" such as possible hail damage, curled shingles, or missing replaced ridge row,[2] with the responses "No" to each inquiry. The Vegas' trial counsel asked Resendez, "You're familiar with the Hidalgo County, McAllen, Mission area . . . . March 29th and April 20th, 2012, hailstorm aren't you?" Resendez replied, "Yes, sir." The Vegas' trial counsel asked, "Now, when you did your inspection, how long was that after those hailstorms," and Resendez responded, "That would have been about

---

[2] Resendez explained, "Ridge row is [in] essence where—where the two roofs meet and it's ridge within the—the—the roof medium, if you will, that's the roll of where two roofs meet."

a year, because it was in March 2013." Resendez confirmed that his street level inspection revealed no issues with the Vegas' roof. Resendez affirmed that he did not see any roof damage such as hail damage, curled shingles, or missing shingles. According to Resendez, had he noticed such damage he would have documented it. When asked by the Vegas' trial counsel, "And so if there was any question in your mind [regarding any damage to the roof], you would have told State Farm, wouldn't you," Resendez replied, "That's correct." Resendez clarified, "I wouldn't have told State Farm in essence, we would have called back the client and let them know what's the issue whether it's a missing shingle or it's a State Farm, at that point doesn't—doesn't necessarily know whether we write it or not." Resendez elaborated that if State Farm decides not to underwrite the policy due to a missing shingle, the client may replace that shingle to get approved for underwriting once the repair has been documented. When asked by the Vegas' trial counsel, "I mean, without a doubt, if there was some issue [with the shingles], you would have told State Farm or the Vegas," Resendez replied, "Yeah. If there were visual issues, I would absolutely."

Mayra testified that she and her husband Ruben have lived in their house for nine years. Mayra stated that prior to September 2013 the roof had never leaked into her house.[3] According to Mayra, she had a garage sale in May 2013, and a customer showed her some shingles on the ground that had fallen off her roof. Mayra stated that she called State Farm and that the representatives at the office told her to call her former insurer, Wellington Insurance ("Wellington"), because "it[ was] too soon." On cross-examination

---

[3] State Farm's records of the claim, which were admitted into evidence, show that Mayra called to report the leak on September 7, 2013.

by State Farm's trial counsel, Mayra clarified that the State Farm representatives she had called informed her that the damage to her roof had been caused by a hailstorm occurring in March 2012. Mayra stated that she told the State Farm representative that the house had not suffered any hailstorm damage in 2012. When she called Wellington, Mayra told the Wellington employee what the State Farm representative claimed had occurred. The Wellington employees instructed Mayra to call State Farm, and she did.

On direct examination, Mayra said, "After that I noticed that they [State Farm] weren't really paying attention to me after the first time I'd called. . . . It was raining a lot and it was pretty much in that month of September of 2013, it had rained pretty much all month long." Mayra testified that she then noticed that the living and dining rooms were "full of water." Mayra investigated by asking her children if they had spilled the water, and they had not spilled any water. Mayra stated that she then discovered that the water was "coming in through the roof." Mayra testified that because it was a weekend, she called State Farm's 1-800 number, and a representative instructed her to cover the roof and to keep the receipts because State Farm would be responsible for it. Mayra stated that the representative told her that an inspector would be sent. According to Mayra, she called the 1-800 number and Resendez's office on multiple occasions inquiring about the inspector and that "[p]robably about 20 days had passed, then [Mayra] spoke with [the inspector] Ms. [Sylvia] Garza." During Mayra's testimony, she identified different areas of the house that were damaged in pictures admitted into evidence.

Mayra testified that Sylvia arrived to make an inspection on September 25, 2013. Mayra stated that Sylvia told her that the damage was minimal and that she could get it

6

fixed for approximately $1,500.[4]  Mayra stated that she was not satisfied because there had been additional damage to the house and called Resendez's office leaving messages.  Mayra testified that because she could not speak with Resendez, she then called the 1-800 number and talked to a manager who Mayra claimed "laughed sarcastically" and told her "we're not going to help you."[5]  Mayra said she told the manager she would hire an attorney, and he replied, "[you can] do whatever you want."   Mayra hired her trial counsel and then a "public adjuster," Corey Garza, inspected the Vegas' house.  On re-direct examination, Mayra stated the house did not have a carport, that the family's three vehicles had been insured by State Farm when the hailstorm occurred, that the family's vehicles did not sustain any hailstorm damage, and that the Vegas made no claim to State Farm for hailstorm damage to their vehicles.

Sylvia, a claim representative for State Farm, testified that she inspected the Vegas' house for State Farm, and she recalled that Mayra showed her the area of concern in the living room area, the ceiling where it peaked and at the base, and where some water had been "coming down a pillar in the living room."  During her testimony, Sylvia referred to the pictures she took that were admitted into evidence.  Sylvia noted that there was some water damage to a pillar in the house; however, she did not see any drywall dropping off, sagging, or warping on the ceiling.  Sylvia saw that there was some water damage to the ceiling in the living room near the pillar and that there was some damage to the ceiling on the back patio.  Sylvia did not inspect the attic, and she believed that the

---

[4] According to Mayra, a repairman "patched" the roof in order to stop the water from leaking into her house and the Vegas have done "very little" repairs to the house.

[5] Rick Freymann, the State Farm manager who Mayra claimed laughed at her, testified that he did not laugh at her or her children and that he was unaware that she had children.

7

water had leaked into the house in the location of where she observed missing shingles on the roof.[6] When asked by the Vegas' trial counsel, "But there's a gap between where the pillar is and where the roof is . . . [h]ow did the [water] come from the roof to the pillar," Sylvia said, "I—I—that I don't know." Sylvia acknowledged that it was possible that she may have missed something during her inspection. Sylvia disagreed with Mayra that the framing of the pillar had to be replaced because according to Sylvia, replacement of the framing would only be required if "[o]ver a period of time" a continuous leak occurring "for months and months and months, and the framing never dried" caused it to then develop rot. Sylvia testified that the pillar was dry when she inspected it. When asked about the baseboards of the pillars, Sylvia stated that it appeared from the pictures that the baseboards were missing. Sylvia could not recall whether she discussed the baseboards with Mayra. Sylvia agreed that if the baseboards had been damaged due to the leak in the roof, those baseboards would have been covered by the policy.[7]

Sylvia testified that when she examined the roof, she found "some wind damage" that "was really close to the area of the water damage." Sylvia testified that she observed damage from the 2012 hailstorms throughout the roof. When asked by the Vegas' trial counsel whether the hail damage she observed caused the water leak, Sylvia replied, "Not based on—on what I saw. Not to the best of my knowledge. What I saw was missing shingles that looked like may—you know, water could have easily leaked through." Sylvia

---

[6] Freymann clarified that Sylvia found four shingles missing that had been caused by wind damage. However, an estimate to remove and replace the damaged shingles in State Farm's records shows that State Farm only estimated that the Vegas were entitled to removal and replacement of three shingles.

[7] Freymann testified that Mayra had told him that the baseboards had suffered water damage, but Sylvia had not "accounted" for the baseboards in her estimate. However, Freymann did not believe that the cost of replacing the baseboards would have caused the repair costs to exceed the deductible.

8

concluded that the water damage to the interior of the house was caused by the wind damage to the roof and was not caused by the hail damage she observed. Regarding the damage to the ceiling of the patio, Sylvia did not conclude it had been caused by wind damage to the roof. However, although she did not believe that the damage to the patio's ceiling was caused by wind damage, Sylvia still included the repairs to it in her estimate.

When asked, "[T]o the extent that [Mayra] says there was more wind damage to her roof than what you found, that still is a—resulting from the—a covered loss within her policy period, correct," Sylvia responded, "I would agree with that, yes." Sylvia also agreed that if there were more insulation damage than what she estimated, that loss would have occurred during the policy period. Sylvia stated, "And if it was more insulation that was damaged, you know, from this same event, then that would put it in the policy period." Sylvia affirmed that "[i]f the framing was damaged to the extent that it required replacement and we could attribute it to the same event, then it would fall, you know, in the policy period." Sylvia acknowledged that, although Mayra claimed that there was water damage in other parts of the house as a result of the leaking roof, Sylvia could not tell if Mayra was correct or incorrect because Sylvia did not inspect any other parts of the house. Sylvia further stated that if there were water damage in other parts of the house, the repairs would have been covered under the policy if caused by the same event.[8] Sylvia did not notice any pre-existing damage in the home during her inspection.

Sylvia read her report into the record as follows:

---

[8] Sylvia testified that Mayra did not tell her that there had been water damage in the parts of the house that she did not inspect, including water stains in the bathroom, water leaking in her bedroom, furniture damage, picture frames that were damaged, or clothing that was damaged and that the policy holder has a duty to show the claims adjuster the damage that the policy holder would like to claim.

Inspection revealed interior water damage to living room ceiling and down pillar, and to patio ceiling due to a roof leak. Conducted roof inspection. Found—roof had hail damage throughout from 2012 hailstorm. No hailstorms this year in McAllen. No coverage for the hail since policy was not issued until this year, which would have—which was 2013. Advised insured of my findings, and did not cover for hail damage, but would estimate the minor wind damage. Policyholder states roof leak with recent rains that came with wind. Advised insured I would prepare and followup with her. Agreed.

. . . .

Estimate completed. To repair interior water damage to the sheetrock, on the pillar, the ceiling and to R&R, rebuild and replace blown acoustic, and include minor repair to the roof, due to wind damage.

Corey Garza, the Vegas' expert, testified that after inspecting the Vegas' roof he observed some creased shingles, some torn shingles, and some missing shingles. Corey stated that in several ten-by-ten areas of the Vegas' roof there were multiple shingles that had suffered wind damage. Corey concluded that over 200 shingles suffered damage and that a total roof replacement was required due to the amount of damaged shingles.

Regarding the interior of the house, Corey found damage in the living room, in the ceiling of the dining room, to a column that he noticed was damp, and in a spare bedroom. Corey stated that there was damage in the attic over the living/dining room area where the columns were located, which is in close proximity to the spare bedroom. According to Corey, the insulation in the attic "was damped, and actually had been compressed down from water continually falling on it." During his testimony, Corey referred to and pointed to pictures admitted into evidence.

Corey testified that he used Xactimate, which Sylvia also used, to generate an approximate estimate of what it would cost to make the necessary repairs for the damage he found to the Vegas' home. Corey explained that Xactimate is a tool that is user

10

friendly; however, Corey opined that although Xactimate calculates the estimated cost of repairs, in his experience those estimates are "not very reliable" and he always calls contractors to verify the Xactimate's estimated costs of repairs. Corey determined that repairs were necessary to the entire roof, the living room, the dining room, and the spare bedroom. Corey concluded that it would cost $25,189.18 to make repairs to the Vegas' house. Corey stated:

> The estimate is for the totals of the roof replacement, the drywall repairs that need to be done in the living room ceiling, the dining room ceiling, the spare bedroom. The aspects for the general contractor, and the overhead and profit for a general contractor to perform the repairs.

> . . . .

> For the living room, I was to—proposing to take down the ceiling; the insulation, to spray for antimicrobials to prevent molds from developing in those areas.

> Reattach those, hang the drywall, tape it, texturize it, [and] apply the popcorn. And paint—seal and paint the areas.

> [In the spare bedroom, i]t was taking down of the drywall ceiling, the insulation, the spraying, and the same methods would apply as to reapply the texture and popcorn, things like that.

Corey conceded that he made mistakes when he made his estimate. Corey stated, "One of the mistakes was a charge, a second charge for the removal of popcorn, because that is actually removed at the time of removing the drywall," which should have shown in his estimate to have cost approximately $71 for the living room, $70 for the dining room, and $31 or $32 for the spare bedroom. Corey testified that he also incorrectly documented the square footage of the spare bedroom's ceiling, as 187 square feet whereas it should have been about 120 to 121 square feet. Corey stated that he had already subtracted the amount of those errors from his estimate of $25,189.18.

11

On cross-examination by State Farm, Corey acknowledged that at his deposition he testified that he attributed the damage to the Vegas' roof to wind damage occurring in April 2012, a period prior to the Vegas' acquiring the State Farm insurance policy.

## C.    Question No. 1

First, State Farm argues that there is no evidence to support the jury's affirmative answer to question one that State Farm failed to comply with the insurance policy by failing to pay for all the damages in excess of the deductible resulting solely from a storm during the policy period.  Specifically, as we understand it, State Farm argues that no evidence supports that the amount of damages exceeded the deductible of $2,048.[9]

Corey testified that the spare bedroom, the living room, and the dining room required repairs that Sylvia had not included in her estimate.  Sylvia and Corey testified that the damages to the interior of the Vegas' house was a result of the leak in the roof caused by the wind damage.  Sylvia acknowledged that she may not have documented all of the damage to the Vegas' house when she inspected the home.  In addition, Corey testified that there were other necessary expenses to repair portions of the house that Sylvia found required repairs but those expenses were not included in her estimate.  The trial court admitted State Farm's records of the Vegas' claim into evidence, which included estimated costs for the repairs that Sylvia agreed were necessary due to the water damage caused by the wind damage to the roof.

A report from State Farm that the trial court admitted into evidence shows that it would cost $10.67 to remove and replace one shingle; the report accounts for removal

---

[9] State Farm does not specifically challenge that the damage to the roof that Corey attributed to wind did not occur during the policy period.

12

and replacement of only three shingles. However, Corey testified that he found over 200 shingles that had been damaged due to the wind when he inspected the roof.[10] Based on this evidence, the jury could have reasonably found that the cost to remove and replace the other 197 shingles that Corey testified had sustained wind damage would cost approximately an additional $2,101.99.[11] Therefore, viewing the evidence in the light most favorable to the verdict, crediting any favorable evidence if a reasonable fact-finder could and disregarding any contrary evidence unless a reasonable fact-finder could not, we conclude that the evidence is legally sufficient to support the jury's finding to question one that the damages were in excess of the deductible, which was $2,048. *City of Keller*, 168 S.W.3d at 821–22, 827. We overrule State Farm's first issue.[12]

## D.    Extra-Contractual Claims

By its second issue, State Farm contends that a take-nothing judgment should be rendered on the Vegas' extra-contractual claims because we must sustain its first issue.

---

[10] State Farm notes that its expert contradicted Corey's testimony that the damage to the shingles were caused by wind. However, as the sole judge of the witnesses' credibility, the jury may have chosen to believe one witness over another. *City of Keller v. Wilson*, 168 S.W.3d 802, 819–20 (Tex. 2005). "Because it is the jury's province to resolve conflicting evidence, we must assume that jurors resolved all conflicts in accordance with their verdict." *Figueroa v. Davis*, 318 S.W.3d 53, 60 (Tex. App.—Houston [1st Dist.] 2010, no pet.).

[11] Question No. 2 asked, "What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Ruben and Mayra Vega for their unpaid damages *that resulted solely from a storm during the policy period*?" (Emphasis added.) The jury answered, "$2,100," which is above the deductible amount of $2,048.

We note that question No. 4 asked the jury to determine the amount it would cost to properly repair Ruben and Mayra Vega's property, and the jury responded $12,000. However, question No. 4 did not limit the jury's answer to the cost of repairs that resulted solely from a storm during the policy period. It asked, "What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Ruben and Mayra Vega for their damages, if any, that were caused by [State Farm's] unfair or deceptive act or practice," and what is "[t]he cost to properly repair Ruben and Mayra Vega's property?"

[12] State Farm does not contend on appeal that the wind damage did not result solely from a storm during the policy period.

13

At the jury charge conference, State Farm objected to Question No. 3, dealing with extra-contractual claims, not including a predicate. Specifically, State Farm argued:

STATE FARM: But, Judge, going back. I'm sorry. Going back to three, I would ask that three be predicated. I understand that they're objecting to, you know, they wouldn't agree to that. But in my proposed three it's predicated on a finding of breach of contract that, you know, I believe the loss is pretty clear.

COURT: Well, three is deceptive trade.

STATE FARM: Yeah. But I think the law is pretty clear that if there's no breach of contract, there can't be any bad faith. Now, there's a case that came out recently from the Corpus Christi Court of Appeals that I—and ethically bound to—well, I'm not even ethically bound to disclosed [sic], because it's not a published opinion.

COURT: But still, unpublished opinion have the same authority. You are under an obligation.

STATE FARM: Okay. Well, I'm letting you know. It's the—I think it's USAA versus Menchaca and it's on appeal to the United—to the United States—the Texas Supreme Court and they're briefing it right now. But it did—well, it didn't specifically—

COURT: Well, before you waste a lot of words, do you object that it be conditioned?

STATE FARM: Yes. I believe it should be—

COURT: No, no. Do you object, the plaintiff?

THE VEGAS: We object because they're not just conditioning this question. They're conditioning every other question that the jury would have to answer yes to breach of contract or they don't have to answer any other questions. That's directing the jury as to the legal effect of their answers to the first question.

COURT: I'm going to overrule the defendant's objection that it be conditioned. I'll leave it as—I'm not going to condition it.

In State Farm's opening brief before us, the entirety of its challenge to the final judgment's finding of liability on the Vegas' extra-contractual claims provides:

14

A.     Under Texas law, extra-contractual claims fail in the absence of contractual liability.

It is well-settled in Texas that, when an insurer has no liability under an insurance policy, the insurer also has no liability for common law or Insurance Code claims related to the investigation and payment of the claim. In *Progressive County Mut[ual] Ins[urance] Co[mpany] v. Boyd*, the Texas Supreme Court wrote that common law bad-faith claims must be predicated on either contractual liability or outrageous conduct that causes independent harm. 177 S.W.3d 919, 922 (Tex. 2005). The Supreme Court explained:

> Boyd's common-law bad-faith claims are also negated by the determination in the breach of contract claim that there was no coverage. We have left open the possibility that an insurer's denial of a claim it was not obliged to pay might nevertheless be in bad faith if its conduct was extreme and produced damages unrelated to and independent of the policy claim.

*Id.* (citations omitted). Further, in *State Farm Lloyds v. Page*, the Supreme Court held that "[t]here can be no liability under either Article 21.55 or Article 21.21 of the Insurance Code if there is no coverage under the policy." 315 S.W.3d 525, 532 (Tex. 2010); *see also JAW the Pointe, L.L.C. v. Lexington Ins. Co.*, 460 S.W.3d 597, 610 (Tex. 2015). These statutes governing unfair settlement practices and prompt payment of claims are now codified in the Insurance Code, and include Section 541.060(2) and (7), which are the provisions at issue in this case.

The Vegas failed to prove that State Farm owed any additional coverage and thus had breached the insurance policy (as explained in Issue I). Accordingly, their common law bad faith claim (in Jury Questions 8 & 9) and Insurance Code claims (in Jury Questions 3, 4, & 5) fail as a matter of law. [Footnote 73] For this reason alone, this Court should reverse the trial court's judgment and render a take-nothing judgment on the Vegas' extra-contractual claims.

Footnote 73 of State Farm's initial brief provides, "To the extent any confusion remains about this principle, the Supreme Court will likely provide clarity in *USAA Texas Lloyds Co. v. Menchaca*, Cause No. 14-0721, which was argued on October 11, 2016."

Based upon State Farm's arguments in the trial court at the jury charge conference and in its opening briefing, its challenge to the final judgment's finding of liability on the

15

Vegas' extra-contractual claims is premised on its argument that there was legally insufficient evidence supporting the jury's "Yes" answer to Question No. 1, which was presented to us in State Farm's first issue.

Nevertheless, in its reply brief and on rehearing State Farm emphasizes the Texas Supreme Court's holding in *USAA Texas Lloyds Co. v, Menchaca*, No. 14-0721, 2017 WL 1311752 (Tex. Apr. 7, 2017, reh'g granted), and the Vegas' election to forgo recovery on the damages the jury awarded in relation to the breach of contract claim and instead recover the damages the jury awarded in relation to the extra-contractual claims. The contention that the Vegas' election invalidates the contractual claim and precludes recovery on the extra-contractual claims was made for the first time in State Farm's reply brief, and we need not consider it. *See* TEX. R. APP. P. 38.3; *Humphries v. Advanced Print Media*, 339 S.W.3d 206, 207–08 (Tex. App.—Dallas 2011, no pet.) (providing that an issue raised for the first time in a reply brief will not be considered).

Notwithstanding such waiver, considering *Menchaca* as currently drafted, and recognizing that the Texas Supreme Court has granted rehearing in it, we find that State Farm's reliance on *Menchaca* is misplaced. Unlike this case, the jury in *Menchaca* found in the insurer's favor on the insured's breach-of-contract claim. 2017 WL 1311752, at *1. The Texas Supreme Court then concluded that, notwithstanding a finding that the insurer waived its argument during the jury charge conference, we erred by affirming the trial court's decision to disregard the jury's answer relating to the breach-of-contract claim question. *See id.* at *14. The trial court in this case did not disregard a jury's answer regarding liability. Instead, it granted the Vegas' request to elect their remedy.

Accordingly, we overrule State Farm's second issue.

16

## E.    Extra-Contractual Damages

By its third issue, State Farm contends that there is no evidence to support the jury's award of extra-contractual damages "because the Vegas failed to prove State Farm's allegedly wrongful conduct caused the damages the jury awarded." Specifically, State Farm argues that "the evidence shows that the damage to the Vegas' house was caused by a wind event, an air conditioner leak, a deteriorated rubber boot at the bottom of a pipe vent, and 'normal weathering' and aging." However, this contrary evidence was within the province of the jury to reconcile, and we disregard any contrary evidence unless a reasonable fact-finder could not. *See Figueroa v. Davis*, 318 S.W.3d 53, 60 (Tex. App.—Houston [1st Dist.] 2010, no pet.); *see also See City of Keller*, 168 S.W.3d at 827.

Regarding causation, the jury could have reasonably inferred that the damages found by the jury were caused by State Farm because the jury also made findings—unchallenged on appeal—that State Farm failed to effectuate a prompt, fair, and equitable settlement of the claim when its liability had become reasonably clear or refused to pay the Vegas without conducting a reasonable investigation of the claim.[13] *See Republic*

---

[13] In *Arnold v. National County Mutual Fire Insurance Co.*, 725 S.W.2d 165, 167 (Tex. 1987), the Texas Supreme Court held that "[b]etween an insurer and the insured, there is a duty on the part of the insurer to deal fairly and in good faith in the processing of claims." *Vail v. Tex. Farm Bureau Ins. Co.*, 754 S.W.2d 129, 135 (Tex. 1988). In *Aranda v. Insurance Co. of North America*, 748 S.W.2d 210, 212–13 (1988), the Texas Supreme Court "held that an insurer breaches the duty of good faith and fair dealing by failing to promptly and equitably pay an insured's claim when liability becomes reasonably clear." *Id.* The Texas Supreme Court stated that its "holdings in *Arnold* and *Aranda* are determinations pursuant to law that an insurer's lack of good faith in processing a claim is an unfair or deceptive act." *Id.* (citing *Aranda*, 748 S.W.2d 212–13; *Arnold*, 725 S.W.2d at 167). "An insurance company has exclusive control over the evaluation, processing and denial of claims. For these reasons a duty is imposed that '[An] indemnity company is held to that degree of care and diligence which a man of ordinary care and prudence would exercise in the management of his own business.'" *Arnold*, 725 S.W.2d at 167.

Here, the jury charge question No. 3 asked, "Did State Farm Lloyds engage in any unfair act or practice that caused damages to Ruben and Mayra Vega?" Parts A and B of question No. 3 stated, "'Unfair or deceptive act or practice' means any of the following:" (A) "Failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of Ruben and Mayra Vega's claim when State Farm Lloyds' ability under the Insurance Policy has become reasonably clear"; or (B) "Refusing to pay Ruben and Mayra Vega's claim without conducting a reasonable investigation of the claim." The jury answered "Yes" to both parts A

17

*Ins. Co. v. Stoker*, 903 S.W.2d 338, 341 (Tex. 1995) (providing that when an insurer fails to timely investigate a claim or commits an extreme act that causes an independent injury to the policy holder, an insurer is liable for extra-contractual damages). The jury could have reasonably determined, based on evidence that had State Farm initially paid for the necessary repairs to the Vegas' roof for the wind damage that further damage to the interior of the house would not have occurred if State Farm had conducted a reasonable investigation or attempted in good faith to effectuate a prompt, fair, and equitable settlement when it became reasonably clear of State Farm's liability under the policy. *See United Servs. Auto. Ass'n v. Gordon*, 103 S.W.3d 436, 442 (Tex. App.—San Antonio 2002, no pet.) ("An insured is not entitled to recover extra-contractual damages unless the complained of actions or omissions cause injury independent of the injury resulting from a wrongful denial of policy benefits."). Accordingly, we cannot conclude that the evidence is legally insufficient to support the jury's finding that State Farm's wrongful conduct caused the extra-contractual damages.

Next, State Farm argues there was no evidence to support the jury's award of $412 for expenses "incurred in attempting to repair or protect the property." There was evidence presented that the Vegas purchased two tarps for $6 each and that in January, approximately four months after Sylvia inspected the property, the Vegas paid a roofer $350 to $400 to patch the roof. This is more than a scintilla of evidence to support the jury's award to the Vegas of $412 because the jury may have reasonably found that, had State Farm initially properly investigated the damages to the Vegas' house and settled the claim, the Vegas would have repaired the roof shingles that had been damaged by

and B of question No. 3. State Farm does not specifically challenge these two findings on appeal.

18

the wind and would not have had to purchase the tarps and pay for patching the roof. We overrule State Farm's third issue.

## F.     The Texas Insurance Code

By a sub-issue, State Farm contends that "[t]here is no evidence of a 'knowing' violation" as defined by the Texas Insurance Code. *See* TEX. INS. CODE ANN. § 541.002 (West, Westlaw through 2017 R.S.) (defining "knowingly" as an "actual awareness of the falsity, unfairness, or deceptiveness of the act or practice on which a claim for damages . . . is based"). Specifically, State Farm challenges the jury's answer to question No. 5 asking whether State Farm *knowingly* engaged in any unfair or deceptive act or practice.[14] The Vegas respond that "actual awareness" can be inferred from the evidence presented.

Question No. 5 defined "knowingly" as an "actual awareness, at the time of the conduct, of the falsity, deception, or unfairness of the conduct in question." And it instructed "Actual awareness may be inferred where objective manifestations indicate that a person acted with actual awareness." The jury answered "Yes" to question No. 5.

State Farm argues, "Neither direct nor consequential evidence shows anyone at State Farm knew they were being unfair or deceptive to the Vegas when they conducted the investigation or prepared the estimate." State Farm argues that the evidence shows that Mayra only had complaints about the framing of the pillar and that Corey did not find any problems with the pillar; therefore, the evidence merely shows a disagreement about the extent of the necessary repairs, which is not evidence of knowingly acting in bad faith.

---

[14] The jury also answered "Yes" to question No. 3 asking, "Did State Farm Lloyds engage in any unfair or deceptive act or practice that caused damages to Ruben and Mayra Vega?" State Farm does not challenge this finding and only challenges the jury's finding that it did so knowingly.

19

However, the jury also heard evidence that Sylvia only inspected certain areas of the house and that Sylvia did not inspect the attic. The jury could have reasonably found that it was State Farm's duty to properly inspect the Vegas' house for damage and not Mayra's duty as a lay person to know where the leak originated. Moreover, there was evidence that Sylvia spent less than five minutes inspecting the Vegas' house, did not properly check the roof for shingles damaged by the wind, did not go into the attic, ignored Mayra's requests to inspect other rooms of the house, and did not know whether there had been any water damage to those non-inspected rooms.

In addition, when Mayra first called State Farm in May 2013 about the shingles that were blown off the roof, State Farm representatives told her, without even investigating the claim, that any damage to the roof would not be covered by State Farm because the damage had been caused by a hailstorm occurring in 2012 prior to her policy with State Farm and that she needed to call her previous insurance company. This information was given to Mayra despite the fact that Resendez testified that when he inspected the property, he did not note any damage to the roof, and despite the fact that once Sylvia inspected the property, she found that wind damage to the roof was a covered event. Corey testified that there were over 200 wind-damaged shingles on the roof, and although Sylvia inspected the roof, State Farm determined that there were three shingles damaged by the wind. Evidence was presented that when Mayra disagreed with Sylvia's estimate, State Farm agreed to send another inspector to the Vegas' house, but it did not do so. The evidence showed that Mayra called State Farm on September 7, 2013 to report the leak in her roof, and State Farm waited nine days to assign an inspector. It then took Sylvia, the assigned inspector, another nine days to inspect the Vegas' house.

20

The Vegas also point out that although State Farm knew that Mayra did not speak or read English, it sent its estimate of the damages to her only in English. And, when Mayra complained about the estimate, State Farm told her she needed to hire a contractor to assess the damages before State Farm would re-inspect her property, although there is nothing in the policy requiring that she do so. Viewing the evidence in the light most favorable to the verdict, crediting any favorable evidence if a reasonable fact-finder could and disregarding any contrary evidence unless a reasonable fact-finder could not, we conclude that the evidence is legally sufficient to support the jury's finding that State Farm acted knowingly.[15] *See City of Keller*, 168 S.W.3d at 821–22, 827. We overrule State Farm's sub-issue.

## II. ATTORNEY'S FEES

By its third issue, State Farm contends that there is legally and factually insufficient evidence to support an attorney fee award pursuant to the lodestar method and the market value method. The Vegas argue that State Farm failed to preserve its legal and factual sufficiency issues for appeal.

> Except for fundamental error, to preserve a complaint for appellate review, a party must present to the trial court a timely and specific request, objection, or motion. TEX. R. APP. P. 33.1(a); *Wal–Mart Stores, Inc. v. McKenzie*, 997 S.W.2d 278, 280 (Tex. 1999) (per curiam). In particular, to preserve a legal-sufficiency challenge, a party must have specifically raised its complaint in: (1) a motion for instructed verdict; (2) an objection to the submission of a jury question; (3) a motion for judgment notwithstanding the verdict; (4) a motion to disregard the jury's answer to a vital fact question; or (5) a motion for new trial. *Cecil v. Smith*, 804 S.W.2d 509, 510–11 (Tex. 1991); *U.S.A. Precision Machining Co. v. Marshall*, 95 S.W.3d 407, 411 (Tex. App.—Houston [1st Dist.] 2002, pet. denied). Similarly, a motion for new trial is required to complain of factual insufficiency of the evidence to support a jury finding. TEX. R. CIV. P. 324(b)(2).

---

[15] As previously noted, State Farm has not challenged the jury's finding that it engaged in an unfair or deceptive act.

*Gerdes v. Kennamer*, 155 S.W.3d 523, 531–32 (Tex. App.—Corpus Christi 2004, pet. denied); *see also In re J.P.B.*, 180 S.W.3d 570, 574 (Tex. 2005) (agreeing with the court of appeals that the appellant failed to preserve a legal sufficiency "no evidence point" by one of the five methods listed above); *In re C.S.*, No. 13–13–00095–CV, 2013 WL 3895818, at *6 (Tex. App.—Corpus Christi July 25, 2013, no pet.) (mem. op.) (concluding that the appellant failed to preserve his legal sufficiency issue by not challenging the legal sufficiency of the evidence in the trial court and that the appellant failed to preserve his factual sufficiency issue by not filing a motion for new trial).

State Farm does not cite where in the record it preserved its legal sufficiency complaint regarding attorney's fees. Out of an abundance of caution and in our discretion, we have independently reviewed the record to the extent possible to determine whether the issue has been preserved by one of the five methods listed above. *See Gerdes*, 155 S.W.3d at 531–32. On appeal, State Farm specifically argues that the evidence is legally insufficient to support the jury's award of attorney's fees because the Vegas' attorney "provided no records or testimony about the specific legal work performed in this case, nor did he explain how any of the hours worked or fees attributed to that work were reasonable and necessary."

Although State Farm requested an instructed verdict, it did not do so on the basis that the evidence is insufficient to support an award of attorney's fees.[16] At the formal charge conference State Farm did not object to question No. 10 asking, "What is a

---

[16] State Farm argued for a directed verdict on the Vegas' breach of contract and extra-contractual claims arguing that Corey testified that the damage to the Vegas' roof occurred in 2012, prior to when the Vegas' policy with State Farm began in March 2013.

reasonable fee for the necessary services of Ruben and Mayra Vegas' attorneys in this case stated in dollars and cents," on the basis that the evidence was legally insufficient. Instead, State Farm objected to question No. 10 because (1) "State Farm Lloyds is an incorporated association of underwriters, not an individual or corporation as set forth in Texas Civil Practices and Remedies Code Chapter 38" and (2) State Farm "believe[d] that . . . an additional blank for representation through July 1st, 2014" was necessary. In its motion for judgment notwithstanding the verdict/motion to disregard certain jury findings, State Farm did not challenge the sufficiency of the evidence supporting the jury's award of attorney's fees.[17] Finally, in its motion for new trial, State Farm did not contend that the evidence is legally insufficient to support the jury's finding regarding attorney's fees.

Because State Farm did not specifically raise its complaint regarding the legal sufficiency of the evidence to support the attorney's fees in: (1) a motion for instructed verdict; (2) an objection to the submission of a jury question; (3) a motion for judgment notwithstanding the verdict; (4) a motion to disregard the jury's answer to a vital fact question; or (5) a motion for new trial, it has not preserved this issue for appeal. *See Gerdes*, 155 S.W.3d at 531–32. Furthermore, because State Farm did not challenge the factual sufficiency of the evidence supporting the jury's award of attorney's fees in its motion for new trial, we conclude that it did not preserve its factual sufficiency issue for our review. *See id.* at 532. We overrule State Farm's third issue.

---

[17] State Farm argued in its motion for judgment notwithstanding the verdict that "[t]he Court should disregard the jury's answer to Question No. 10 regarding attorney's fees" because State Farm is neither an individual nor a corporation under the Texas Insurance Code. *See* TEX. INS. CODE ANN. § 38.001 (West, Westlaw through 2017 R.S.) ("A person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for . . . an oral or written contract.").

## III.    SETTLEMENT OFFER

By its fourth issue, State Farm contends that it is "entitled to a take-nothing judgment based on its settlement offer under Texas Civil Practice and Remedies Code, Chapter 42 and Texas Rule of Civil Procedure 167.  Specifically, State Farm argues that the $2,100 amount awarded by the jury on the Vegas' breach of contract claim does not exceed 80% of the amount that State Farm offered the Vegas.

> Chapter 42 of the Texas Civil Practice and Remedies Code governs the award of litigation costs against a party who rejects an offer of settlement made in accordance with its provisions.  *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 42.001–.005 (West[, Westlaw through 2017 R.S.)]. Under Chapter 42, if a settlement offer is made and rejected, and the judgment ultimately proves to be significantly less favorable to the rejecting party than the settlement offer, then the offering party shall recover litigation costs from the rejecting party from the time the offer was rejected to the time of judgment.  *Id.* § 42.004(a), (c).

> . . . .

> Similar to Chapter 42, Rule 167.4(a) provides that if a settlement offer made under the rule "is rejected, and the judgment to be awarded on the monetary claims covered by the offer is significantly less favorable to the offeree than was the offer, the court must award the offeror litigation costs against the offeree from the time the offer was rejected to the time of judgment."  *Id.* 167.4(a).  Rule 167.4(b) states that "[a] judgment award on monetary claims is significantly less favorable than an offer to settle those claims if:  (1) the offeree is a claimant and the judgment would be less than 80 percent of the offer; or (2) the offeree is a defendant and the judgment would be more than 120 percent of the offer."  *Id.* [R.]167.4(b).  Litigation costs awarded to a defendant under Rule 167 "must be made a setoff to the claimant's judgment against the defendant."  *Id.* [R.]167.4(g).

*Note Inv. Grp., Inc. v. Assocs. First Capital Corp.*, 476 S.W.3d 463, 475–76 (Tex. App.—Beaumont 2015, no pet.).

The Vegas requested that the trial court to disregard the jury's award of $2,100 and to enter judgment on the remaining amounts awarded by the jury, which included the amount awarded for proper repairs, incurred expenses, and treble damages totaling

$21,986.47. On appeal, State Farm does not address these damages awarded to the Vegas. Nonetheless, State Farm made an offer of settlement in the amount of $11,000 and 80% of $11,000 is $8,800. The amount awarded to the Vegas, $21,986.47, is greater than 80% of State Farm's offer.[18] *See id.* We overrule State Farm's fourth issue.

## IV.   DISQUALIFICATION OF JURORS

By its fifth issue, State Farm contends that the trial court improperly disqualified venire members 5, 22, 28, 35, 38, 47, and 53 because they were State Farm insurance policy holders.[19] The Vegas respond that State Farm failed to preserve this issue because State Farm did not properly object to the trial court's exclusion of those jurors.

> A trial court's decision regarding challenges for cause is reviewed using an abuse-of-discretion standard. *Guerra v. Wal–Mart Stores*, 943 S.W.2d 56, 59 (Tex. App.—San Antonio 1997, writ denied). Under an abuse-of-discretion standard, the court of appeals cannot overrule the trial court's decision unless the trial court acted unreasonably or in an arbitrary manner, without reference to guiding rules or principles. *Beaumont Bank, N.A. v. Buller*, 806 S.W.2d 223, 226 (Tex. 1991). Moreover, the court of appeals cannot substitute its judgment for the trial court's reasonable judgment even if it would have reached a contrary conclusion. *Walker v. Packer*, 827 S.W.2d 833, 839–40 (Tex. 1992). The trial court does not abuse its discretion if some evidence reasonably supports the trial court's decision. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002). . . . In general, voir dire objections must be timely and plainly presented. *Vasquez*, 189 S.W.3d at 759; *see, e.g., Hallett v. Houston Nw. Med. Ctr.*, 689 S.W.2d 888, 889–90 (Tex. 1985).

---

[18] And, the amount that the jury awarded solely for repairs, $12,000, also exceeds $8,800.

[19] State Farm argues by a sub-issue that the allegedly improper strikes for cause granted to the Vegas resulted in the trial court granting an uneven amount of peremptory strikes with the Vegas getting seven additional peremptory strikes than State Farm and that the "traditional 'harmless error' rule has been relaxed when the trial court has committed error in awarding [peremptory] strikes." (Internal quotations omitted). However, "any error in the trial court's allocation of peremptory challenges must be preserved by a timely, specific objection." *Pojar v. Cifre*, 199 S.W.3d 317, 336–37 (Tex. App.—Corpus Christi 2006, pet. denied) (citing *Tex. Commerce Bank Reagan v. Lebco Constructors*, 865 S.W.2d 68, 78 (Tex. App.—Corpus Christi 1993, writ denied)). Here, State Farm fails to cite any point in the record wherein it objected to the alleged error of improper allocation of peremptory strikes, and we have not found such objection. Thus, we conclude that this sub-issue has been waived.

25

*Solomon v. Steitler*, 312 S.W.3d 46, 59 (Tex. App.—Texarkana 2010, no pet.).

We need not determine whether State Farm properly objected to the trial court's exclusion of jurors 5, 22, 28, 35, 38, 47, and 53 on the basis that they were not interested in the subject matter of the case because even assuming, without deciding, that State Farm properly objected, we have found another ground upon which to overrule State Farm's fifth issue as further explained below.

"It has long been the established rule in this state that even though the challenge for cause was improperly sustained, no reversible error is presented unless appellant can show he was denied a trial by a fair and impartial jury." *City of Hawkins v. E.B. Germany & Sons*, 425 S.W.2d 23, 26 (Tex. Civ. App.—Tyler 1968, writ ref'd n.r.e.); *see also Solomon*, 312 S.W.3d at 59 (presuming that the appellant was afforded a fair and impartial jury and that no harm resulted by the trial court's dismissal of a venireperson because the appellant had not objected to any juror on the panel). And, when the record fails to show that the appellant objected to any juror on the panel and has not shown that it was forced to try the cause before an objectionable juror, we must presume that the appellant was afforded a fair and impartial jury. *City of Hawkins*, 425 S.W.2d at 26. "Consequently, no harm could have resulted to [the] appellant by reason of the action of the court in excusing jurors." *Id.*

Here, when the trial court asked if State Farm objected to the jurors selected for the panel, State Farm replied, "No, Your Honor." Accordingly, because State Farm did not object to any juror on the panel and it has not shown that it was forced to try the case before an objectionable juror, we presume that State Farm was afforded a fair and impartial jury, and no harm could have resulted by reason of the trial court's dismissal of

the jurors stricken for cause. *See Solomon*, 312 S.W.3d at 59; *City of Hawkins*, 425 S.W.2d at 26. We overrule State Farm's fifth issue.

## V.   FACTUAL SUFFICIENCY

By its sixth issue, State Farm contends that there is factually insufficient evidence to support the judgment. State Farm argues as follows: "For the reasons outlined in Issues I, II, and III, there is legally insufficient evidence supporting the judgment on the contract, extra-contractual, and attorney fees claims" and "In the alternative, for the same reasons, the Court should hold that the evidence is factually insufficient because it is so weak as to make the verdict clearly wrong and manifestly unjust."

To preserve a factual sufficiency challenge, the party is required to raise it in a motion for new trial. TEX. R. CIV. P. 324(b)(2). In its motion for new trial, State Farm challenged the jury's bad faith findings; however, on appeal, State Farm does not specifically challenge the jury's findings on bad faith. All of State Farm's other arguments in its motion for new trial pertained to its legal sufficiency challenges. Therefore, we conclude that State Farm did not preserve its factual sufficiency challenges to the extent that State Farm argues on appeal that the evidence is factually insufficient on the same basis that it argues in its brief that the evidence is legally insufficient.[20]

Moreover, State Farm has not explained how the evidence is *so contrary* to the evidence that supports the judgment as to make it clearly wrong and unjust. *See Golden Eagle Archery, Inc.*, 116 S.W.3d at 761 (explaining that in order for this Court to properly apply our factual sufficiency review, when reversing on the basis of factual insufficiency,

---

[20] State Farm does not list or identify the evidence it would like this Court to review. Instead, it merely asks that we review its brief in search of the contrary evidence that makes the verdict improper.

27

we must in our opinions, "state in what regard the contrary evidence greatly outweighs the evidence in support of the verdict"); *Maritime Overseas Corp.*, 971 S.W.2d at 407. "[W]hen reversing a trial court's judgment for factual insufficiency, the court of appeals must detail all the evidence relevant to the issue and clearly state why the jury's finding is factually insufficient or so against the great weight and preponderance of the evidence that it is manifestly unjust[, and] [t]he court of appeals must explain how the contrary evidence greatly outweighs the evidence supporting the verdict." *Maritime Overseas Corp.*, 971 S.W.2d at 407. Because we have no duty to scour the record to support State Farm's factual sufficiency challenges, we are unable to detail all the evidence relevant to the issue and clearly state why the jury's findings are factually insufficient or so against the great weight and preponderance of the evidence that is manifestly unjust. *See id.*; *see also Dunn v. Bank–Tec S.*, 134 S.W.3d 315, 328 (Tex. App.—Amarillo 2003, no pet.) (refusing to scour a voluminous record for evidence supporting the appellant's claims). We overrule State Farm's sixth issue.

## VI.   CONCLUSION

We affirm the trial court's judgment.


                                          **/s/ Rogelio Valdez**
                                          ROGELIO VALDEZ
                                          Chief Justice

Delivered and filed the
12th day of April,  2018.

28